**R.F.M.A.S., INC., Plaintiff,**

v.

**Mimi SO, et al., Defendants.**

**No. 06 Civ. 13114(VM)(MHD).**

United States District Court,
S.D. New York.

Aug. 11, 2010.

Opinion Denying Reconsideration
Oct. 5, 2010.

Kenneth S. Feldman, Law Offices of Stephen E. Feldman, P.C., New York, NY, Kevin P. Crosby, Brinkley, Morgan, Solomon, Tatum, Stanley, Lunny and Crosby, Fort Lauderdale, FL, Stephen Edward Feldman, Paul J. Burgo, Steven Michael Crosby, Feldman Law Group, New York, NY, Theodore

**16**

C. Anderson, Kilgore & Kilgore, PLLC, Dallas, TX, for R.F.M.A.S., Inc.

Deepro R. Mukerjee, Alston & Bird, LLP, New York, NY, Martin J. Elgison, Alston & Bird, LLP, Atlanta, GA, Paul J. Sutton, Greenberg Traurig, LLP, New York, NY, Victoria Elizabeth Spataro, Alston & Bird, LLP, New York, NY, Barry George Magidoff, Sutton Magidoff, LLP, New York, NY, David Jonathan Saenz, Greenberg Traurig, LLP, New York, NY, for Mimi So, Mimi So International, Inc.

Alexander Lloyd Greenberg, Richard Zachary Lehv, Fross Zelnick Lehrman & Zissu, P.C., New York, NY, for Richemont Financiere SA, Compagnie Financiere Richemont SA, Richemont North America, Richemont SA.

Alexander Lloyd Greenberg, Evan Gourvitz, Richard Zachary Lehv, Fross Zelnick Lehrman & Zissu, P.C., New York, NY, for Richemont Holdings I, Richemont International, Ltd.

### *MEMORANDUM & ORDER*

MICHAEL H. DOLINGER, United States Magistrate Judge.

Plaintiff R.F.M.A.S., Inc. ("RFMAS" or "plaintiff") commenced this action against Ms. Mimi So and Mimi So International, Inc. (collectively, "the Mimi So defendants" or "Mimi So") and Richemont SA, Compagnie Financiere Richemont SA, Richemont North America, Inc., Richemont Holdings I, Inc., and Richemont International, Ltd. (collectively, "the Richemont defendants") on November 13, 2006. Plaintiff alleges that several pieces in Mimi So's 2006 "Gate B9" collection of jewelry infringed plaintiff's copyright and trade dress on the design of pieces in its "Stella" collection. (*See* Decision & Am. Order, May 13, 2009, at 4, available at *R.F.M.A.S., Inc. v. Mimi So,* 619 F.Supp.2d 39, 47 (S.D.N.Y.2009); Compl. ¶¶ 37–40).

In this memorandum and order,[1] we address plaintiff's "spoliation motion", in which plaintiff seeks to sanction all of the defendants for a range of related discovery violations over the past four years, including their alleged (1) failure to preserve and make available for plaintiff's inspection exemplars of the allegedly infringing "large-link necklace and bracelet"[2] in Mimi So's Gate B9 Collection, (2) failure to timely provide plaintiff with evidence connecting the item numbers listed on various Mimi So documents to the particular pieces of jewelry in the Gate B9 Collection that those item numbers identi-

---

1. A magistrate judge to whom a district judge has referred pre-trial matters may decide non-dispositive motions by issuing a memorandum and order, which is reviewable by the district judge for clear error, but may only opine on dispositive motions by means of a report and recommendation, subject to the district judge's de novo review. *Compare* 28 U.S.C. § 631(b)(1)(A) *with* 28 U.S.C. § 631(b)(1)(B). A motion for sanctions straddles the line between dispositive and non-dispositive motions. *See generally Kiobel v. Millson,* 592 F.3d 78, 84–91 (2d Cir.2010) (Cabranes, J., concurring); *id.* at 91–105 (Leval, J., concurring); *see also id.* at 97 (Leval, J., concurring) (stating, in context of magistrate judge's authority to impose Rule 11 sanctions, that "[a]nalyzing the effects of the particular sanction imposed by a magistrate judge, to determine whether it is dispositive or non-dispositive of a claim, is the approach that best implements Congress's intent." (citing 12 Wright, Miller & Marcus, Federal Practice and Procedure § 3068.2, at 342 (3d ed.1997))). Although the bounds of a magistrate judge's authority to resolve motions for sanctions are far from clear, the Second Circuit has established that a magistrate judge may decide a motion for sanctions for discovery violations under the Federal Rules of Civil Procedure by memorandum and order, rather than by report and recommendation, at least insofar as the magistrate judge's order does not impose terminating sanctions. *See Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d Cir.1990) (holding that "[m]onetary sanctions pursuant to Rule 37 for noncompliance with discovery orders usually are committed to the discretion of the magistrate [judge], reviewable by the district court under the 'clearly erroneous or contrary to law' standard."); *Kiobel,* 592 F.3d at 88 (Cabranes, J., concurring) ("Magistrate judges have the power to impose sanctions for violations of discovery orders." (citing *id.*)); *Kiobel,* 592 F.3d at 95 (Leval, J., concurring) ("[T]his circuit ruled in 1990 that magistrate judges had the power to impose a sanction for discovery violations under Rule 37 of the Federal Rules of Civil Procedure, so long as the particular sanction did not determine a claim." (citing *Thomas E. Hoar, Inc.,* 900 F.2d at 525)).

2. *E.g.,* Theodore C. Anderson, Esq. Letter to the Court, Jan. 11, 2010 ["Pl.'s Jan. 11, 2010 Letter"] at 9.

fy,[3] and (3) misrepresentations to plaintiff and the court concerning their possession of this evidence. Plaintiff suggests that appropriate sanctions for the alleged spoliation of the jewelry exemplars include an adverse inference instruction [4] and an order excluding any testimony by two of defendants' expert witnesses, who plaintiff alleges had the unfair advantage of being able to examine the large-link necklace and bracelet that were unavailable to plaintiff's experts.[5] Plaintiff does not propose any particular sanction for the alleged failure to timely produce a key to decode the item number system.[6] We also address defendants' cross-motion to sanction plaintiff for what they contend is a meritless and untimely application. (*See* Defs.' Dec. 21, 2009 Letter at 5).

The parties have had ample opportunity to present their arguments and evidence regarding these alleged discovery violations. Plaintiff addressed these issues in a total of 8 briefs with 177 supporting exhibits (many of which comprise multiple documents) [7] submitted in connection with formal motions as well as countless discovery conferences and letters to the court. In August 2008, plaintiff moved for summary judgment against each set of defendants separately [8] and dedicated the bulk of its argumentation in connection with those motions to requesting sanctions for the alleged spoliation of evidence.[9] In ruling on plaintiff's summary-judgment motions, Judge Marrero noted that, despite numerous conferences and communications between my chambers and the parties related to these discovery disputes, I have not made any factual finding of spoliation, and he declined to impose sanctions absent such a finding by me. (Am. Decision & Order, Mar. 31, 2009, at 4, available at *R.F.M.A.S., Inc. v. Mimi So*, 606 F.Supp.2d 497, 498–99 (S.D.N.Y.2009); *see also R.F.M.A.S., Inc.*, 619 F.Supp.2d at 51). Plaintiff then supplemented the substantial briefing and evidence that it had submitted on this issue on summary judgment with four additional letter briefs (with supporting exhibits) submitted between December 21, 2009 and January 15, 2010.[10] Defendants responded to these

---

3. *E.g.*, Theodore Anderson, Esq. *et al.* Letter to the Court, Dec. 15, 2009 ["Pl.'s Dec. 15, 2009 Letter"] at 1, 3.

4. Pl.'s Jan. 11, 2010 Letter at 5, 8–9. Plaintiff proposes the following language for a jury instruction: "Defendants at one time possessed the large link necklace and bracelet. Although Defendants had the large link necklace and bracelet during the course of this litigation, they did not produce it to Plaintiff. You may assume that such evidence would have been unfavorable to Defendants." (*Id.* at 9).

5. *Id.* The experts whom plaintiff identifies as having seen the relevant pieces of jewelry include Carolyn M. Kelly and Anthony Lent.

6. *See* Richard Z. Lehv, Esq. Letter to the Court, Dec. 21, 2009 ["Defs.' Dec. 21, 2009 Letter"], at 5 ("Even in the December 15 letter, plaintiff does [not] explain what relief it seeks in connection with this claim.").

7. See, for example, Exhibit C to plaintiff's December 15, 2009 letter brief, which comprises an endorsed order; five fullpage photos of jewelry; two declarations, each of which has two separate exhibits; a Mimi So billing memo; and an image of a JPEG file.

8. Plaintiff filed one statement of material facts under Local Rule 56.1 and one set of exhibits in support of both motions. (*See* Pl.'s R. 56.1 Statement; Exs. 1–101 to Pl.'s Summ. J. Mots. Ag'st Mimi So and Richemont Defs.; Exs. 102–160 to Crosby Oct. 10, 2008 Suppl. Decl.). As the Mimi So defendants noted, plaintiff's first set of exhibits is not accompanied by a declaration or affidavit, and plaintiff's Rule 56.1 statement is neither captioned nor signed. (Mimi So Defs.' 56.1 Counter–Statement at p. 2). We also note that although courtesy copies of these documents were sent to chambers and they were apparently served on defendants, and they were purportedly filed with the Clerk of the Court on compact disc with the sealed records docketed at # 99 and # 100, the discs plaintiff filed are unreadable.

9. Half of plaintiff's memorandum of law supporting its motion against the Richemont defendants addresses the spoliation issue. (*See* Pl.'s Mem. Law Supp. Summ. J. Mot. Agst. Richemont Defs., Aug. 11, 2008 (filed under seal at Docket # 100), at 13–24). Three-quarters of plaintiff's memorandum of law supporting its motion against the Mimi So defendants addresses this issue. (Pl.'s Mem. Law Supp. Summ. J. Mot. Agst. Mimi So Defs., Aug. 11, 2008 (filed under seal at Docket # 99), at 6–20).

10. *See* Pl.'s Dec. 15, 2009 Letter; Theodore Anderson, Esq. Letter to the Court, Dec. 30, 2009 ["Pl.'s Dec. 30, 2009 Letter"]; Pl.'s Jan. 11, 2010 Letter; Steven M. Crosby, Esq. Decl., Jan. 11, 2008 ["Crosby Jan. 11, 2008 Decl."]; Theodore Anderson, Esq. Letter to the Court, Jan. 15, 2010

charges of spoliation each time that plaintiff raised them.[11] Defendants deny that they violated any discovery obligation with respect to the jewelry in question or that they withheld the key code, as plaintiff alleges.[12]

## I. FACTUAL BACKGROUND

We set forth in this opinion only those facts necessary to understand and resolve this motion. A fuller recitation of the facts and procedural history of this case can be found in the district court's May 14, 2009 decision and amended order resolving the parties' cross-motions for summary judgment. See R.F.M.A.S., Inc., 619 F.Supp.2d at 47–50.

Plaintiff RFMAS is a designer of jewelry sold under the trademark "Faraone Mennella". (Am. Compl. ¶ 13). Amedeo Scognamiglio and Roberto Faraone Mennella are the principals of RFMAS and the creators of the "Stella" collection of jewelry. R.F.M.A.S., Inc., 619 F.Supp.2d at 48. Since 2004, plaintiff has held a copyright for pieces of jewelry that are part of the Stella line. See R.F.M.A.S., Inc., 619 F.Supp.2d at 47, 48. Ms. So is the founder of Mimi So, International, which also creates and sells jewelry. Id. at 49–50. The Richemont defendants are related entities that are implicated in this case because one of the entities held a 40% interest in the stock of Mimi So International from 2003 to 2007. (See Am. Compl. ¶¶ 4–8; Answer, Docket # 28, at ¶¶ 4–8); R.F.M.A.S., Inc., 619 F.Supp.2d at 49.

In the complaint, plaintiff identified four specific pieces of jewelry from Mimi So's Gate B9 collection as allegedly infringing on its copyright and trade dress in the Stella line—two necklaces, a bracelet, and a pair of earrings—and it alleged that all defendants were liable for the infringement. (See Compl. ¶ 18; Ex. C to Compl. (photographs of four pieces of allegedly infringing jewelry)). Plaintiff now complains that all defendants are guilty of destroying or otherwise failing to preserve exemplars of two of these infringing pieces—the bracelet and one of the necklaces—to which plaintiff refers as the "key large-link pieces". (See Pl.'s Dec. 15, 2009 Letter at 1; Defs.' Dec. 21, 2009 Letter at 1). The other grievance plaintiff raises in this motion, regarding "the withheld visual correlation" (see Pl.'s Dec. 15, 2009 Letter, at 3), arises out of a system of item numbers employed by Mimi So to identify its products on invoices, sales reports, and other documents.

### A. Mimi So

Mimi So "is a custom jewelry manufacturer".[13] Each piece of Mimi So jewelry is made-to-order and manufactured mostly by hand, rather than manufactured in bulk by machine, and Mimi So strives to make each piece unique in some way.[14] According to Mr. Richardson, no pair of earrings is exactly alike, and "[i]t is unlikely that there would be more than 20 or so bracelets or necklaces that would look the same." (Richardson Sep. 19, 2008 Decl. ¶ 4).

["Pl.'s Jan. 15, 2010 Letter"]; Order, Jan. 6, 2010 (emphasizing that the parties need not repeat any spoliation arguments made on summary judgment).

11. See Mimi So Defs.' R. 56.1 Counter–Statement, filed under seal at Docket # 114, ¶¶ 25–31, 37–50; Richemont Defs.' R. 56.1 Counter–Statement, redacted version at Docket # 109, unredacted version filed under seal at Docket # 120, ¶¶ 25–31, 37–50; Mimi So Defs.' Mem. Law Opp. Summ. J. Mot., Sep. 19, 2008, filed under seal at Docket # 114, at 9–15; Richemont Defs.' Mem. Law Opp. Summ. J. Mot., Sep. 19, 2008, redacted version at Docket # 108, unredacted version filed under seal at Docket # 120, at 20–25. In addition to their submissions in opposition to plaintiff's motions for summary judgment, defendants addressed the spoliation allegations in a joint pre-motion letter (Defs.' Dec. 21, 2009 Let-

ter) and a joint memorandum in opposition to plaintiff's motion for spoliation. (Defs.' Mem. Opp. Pl.'s Mot. for Sanctions, Jan. 14, 2010 ["Defs.' Jan. 14, 2010 Mem."]).

12. See, e.g., Defs.' Dec. 21, 2009 Letter at 1 ("No jewelry has been withheld."), 5 ("Plaintiff has been given the sales information it needs.").

13. William Richardson Decl. Supp. Mimi So Defs.' Opp. to Summ. J. Mot., Sep. 19, 2008, filed under seal at Docket # 114 [hereinafter "Richardson Sep. 19, 2008 Decl."], at ¶ 3.

14. Id.; see also Richardson Decl., Dec. 14, 2007, Docket # 46 ["Richardson Dec. 14, 2007 Decl."], at ¶ 7 ("the Mimi So Gate B–9 Collection jewelry items are all hand-made, and, except for a few prototype samples, substantially all made to order. [ ... ] As a result of always being hand-

The large-link necklace and bracelet from Mimi So's Gate B9 Collection that are at issue in this motion are chains comprised of circular and oblong gold links.[15] One of plaintiff's experts described the links as being "faceted", creating the visual effect of "apparent twists" in the metal links.[16] The large-link necklace comprises links of three basic sizes. The largest links in the necklace appear to be oblong and about twice the length of the medium-sized links.[17] The Gate B9 collection also features a so-called "medium-link" necklace, which differs from the large-link necklace in that the largest link in the medium-link necklace is smaller than the largest link in the large-link necklace; thus, the difference in the sizes of the largest and medium-sized links in the "medium-link necklace" is not as pronounced as the difference between the size of the largest and medium-sized links in the "large-link necklace".[18]

The large-link pieces were made available for purchase in 2006,[19] and were featured in a 2006 brochure for Mimi So's Gate B9 collection. (*See* Ex. 2 to Pl.'s Summ. J. Mots.).

They were sold at the Mimi So store in New York[20] and on consignment through Neiman Marcus's Precious Jewelry department[21] for thousands of dollars.[22] In 2005, Neiman Marcus photographed a model wearing several pieces of Gate B9 jewelry, including the large-link necklace, and used the photograph in an advertisement for Neiman Marcus. (Richardson Dec. 14, 2007 Decl. ¶ 6; *see also* Ex. D to Am. Compl.).

Mimi So testified that her company stopped producing the so-called large-link necklace and bracelet "at some point during mid–2007." (Mimi So Decl., Dec. 17, 2008, available at Ex. D to Pl.'s Dec. 15, 2009 Letter ["Mimi So Dec. 17, 2008 Decl."] at ¶ 7). She attributed this step to a lack of customer interest. (*Id.*).

As explained by William Richardson, the Chief Financial Officer of Mimi So International in a series of declarations, Mimi So assigns each piece of jewelry an "item number," which consists of a series of letters and numbers that identify various qualities of the piece.[23] These item numbers appear on vari-

made by order from par[t]icular stores[,] each order may differ slightly in configuration.").

15. *See* Ex. 2 to Pl.'s Summ. J. Mots. (on disc filed under seal at Docket # 99–100) (large-link necklace); Ex. E to Pl.'s Dec. 15, 2009 Letter, at 2 (large-link necklace) and 3 (large-link bracelet); Joyce Jonas Report, Sep. 15, 2009, Ex. 3 to Richard Lehv, Esq. Decl., Dec. 1, 2009 ["Jonas Report"] at ¶ 20 (describing plaintiff's allegedly infringed jewelry as "[c]hains of circular links").

16. Jonas Report ¶ 31.

17. *See* Ex. 2 to Pl.'s Summ. J. Mots. (on disc filed under seal at Docket # 99–100) (large-link necklace); Ex. E to Pl.'s Dec. 15, 2009 Letter, at 2 (large-link necklace) and 3 (large-link bracelet).

18. *Compare* Ex. 2 to Pl.'s Summ. J. Mots. (on disc filed under seal at Docket # 99–100) (large-link necklace) *with* Ex. 7 to Defs.' Dec. 21, 2009 letter, at 16 (medium-link necklace); *see also* Ex. 87 to Pl.'s Summ. J. Mots. (Mimi So webpage with image of "Large Diamond Multi-faceted Link Bracelet" at top and "Medium Multi-faceted Link Bracelet" at bottom).

19. *R.F.M.A.S., Inc.*, 619 F.Supp.2d at 49.

20. *See* Pl.'s Dec. 30, 2009 Letter at 2 n. 2 (citing Lent Dep. at 20); Ex. 47 to Pl.'s Summ. J. Mots.

21. Amedeo Scognamiglio Dep., Jan. 10, 2008, available at Ex. 11 to Richard Lehv, Esq. Decl., Dec. 1, 2009, filed under seal at Docket # 196 ["Scognamiglio Dep."] at 67:2–16.

22. *See, e.g.,* Ex. C to Pl.'s Dec. 15, 2009 Letter (Mimi So memo dated Dec. 13, 2007 showing a large-link necklace billed to Neiman Marcus for $6,000); Ex. B to Pl.'s Dec. 15, 2009 Letter (email from John Margiotta, Esq. describing the two pieces of Mimi So jewelry shipped to his firm on March 8, 2007 as "$25,000 worth of jewelry"); Linda Kalmbach Decl., Aug. 10, 2008, Ex. 39 to Pl.'s Summ. J. Mots., at ¶ 4 (stating that Mimi So large-link necklace was priced at $11,500 at Neiman Marcus).

23. Richardson Dec. 14, 2007 Decl.; William Richardson Decl., Apr. 2, 2008, Ex. 30 to Pl.'s Summ. J. Mots. ["Richardson Apr. 2, 2008 Decl."]; William Richardson Decl., Apr. 7, 2008, Ex. 31 to Pl.'s Summ. J. Mot.; Ex. C to Pl.'s Jan. 11, 2010 Letter ["Richardson Apr. 7, 2008 Decl."]; William Richardson Decl., Apr. 10, 2008, Ex. 32 to Pl.'s Summ. J. Mot.; Ex. C to Pl.'s Jan. 11, 2010 Letter ["Richardson Apr. 10, 2008 Decl."]; William Richardson Decl., Apr. 21, 2008, Ex. 33 to Pl.'s Summ. J. Mot. [hereinafter "Richardson Apr. 21, 2008 Decl."]; William Richardson Decl., May 23, 2008, Ex. 34 to Pl.'s Summ. J. Mots.; Ex. D to Pl.'s Jan. 11, 2010 Letter [hereinafter "Richardson May 23, 2008 Decl."]; William Richardson Decl. Supp. Mimi So Defs.' Opp. to Pl.'s Summ. J. Mot., Sep. 19,

ous Mimi So financial documents.[24] For example, the so-called large-link necklace, which plaintiff describes as key to its infringement claims [25], is identified by the item number B9NGYG0000627.[26] The first two digits of the item number (here, "B9") identify the collection of which it is a part—here, the Gate B9 collection of jewelry that is at issue in this litigation.[27] The third digit indicates the type of jewelry (for example, a bracelet, necklace, or earrings)—here, an "N" for "necklace". (*See* Richardson Apr. 2, 2008 Decl. ¶ 4). The fourth, fifth, and sixth digits indicate the kind of metal used—here, "GYG" indicates yellow gold. (*Id.*). The seventh, eighth, and ninth digits indicate the type of gemstone used, if any. (*Id.*). Here, "000" indicates that there are no stones on the necklace. (*Id.*). The tenth and eleventh digits are the "unique number code", or "U# C" for short. (*Id.*). Mimi So assigns a unique number code because the other digits in the item number do not fully capture all qualities of a piece of jewelry. (*See* Richardson Sep. 19, 2008 Decl. ¶ 7). The incorporation of a unique number code allows Mimi So to distinguish between pieces of jewelry that are not the same but would otherwise bear the same item number; the U# C indicates that they differ with respect to some unspecified quality not reflected in the other parts of the item number. (*Id.* ¶ 8). For example, here, the U# C "06" indicates that the so-called large-link necklace is the sixth item made by Mimi So that has the following characteristics: a necklace in the Gate B9 Collection made of yellow gold with no jewels

or stones. (*See* Richardson Apr. 2, 2008 Decl. ¶ 4). The U# C does not, however, indicate how the piece identified as B9NGYG0000627 differs from the first five Gate B9 necklaces made of yellow gold with no jewels or stones or from any subsequent items fitting that general description; it only indicates that it does differ in some respect not otherwise captured by the digits of the item number. (*See id.*). The twelfth and thirteenth digits (if present) indicate the size of the item. (*Id.*). They can indicate generally that it is small, medium, or large, or can refer to a length in inches. (Richardson Sep. 19, 2008 Decl. ¶ 7; *see also* Richardson Apr. 2, 2008 Decl. ¶ 4). Here, "27" indicates that the necklace is 27 inches long. (*See* Richardson Apr. 2, 2008 Decl. ¶ 4; Crosby Jan. 15, 2010 Decl. ¶ 14).

It is impossible to generate a full description of a piece of Mimi So jewelry solely from its item number, because the U# C part of the item number indicates the presence of some quality that distinguishes it from other similar pieces of Mimi So jewelry but does not describe that distinguishing feature. (*See* Richardson Sep. 19, 2008 Decl. ¶ 7).[28] Many of Mimi So's documents therefore identify a piece of jewelry by both an item number and a shorthand textual description.[29] In some cases, the shorthand text provides additional information about the piece that is not reflected in the item number. (Richardson Sep. 19, 2008 Decl. ¶ 10). For example, B9NGYG0000627 is described as "B9 NCK 27in MLTI FCTD LNK, PL 18KY." (Ex. D to Crosby Jan. 11, 2008 Decl.

2008, filed under seal at Docket # 114 [hereinafter "Richardson Sep. 19, 2008 Decl."].

24. *See, e.g.,* Ex. 89 to Pl.'s Summ. J. Mots. (Mimi So wholesale sales summaries).

25. *See* Pl.'s Dec. 15, 2009 Letter at 1 (identifying "Defendants' Gate B9 large link necklace and bracelet" as "the key pieces"); Crosby Jan. 15, 2010 Decl. ¶¶ 15–16 (stating that necklace labeled with item number B9NGYG0000627 "bears a striking resemblance to the picture in the 2006 catalog" that plaintiff alleges is infringing).

26. *See* Ex. B to Pl.'s Dec. 15, 2009 Letter (Mimi So billing memo dated March 8, 2007); Ex. C to Pl.'s Dec. 15, 2009 Letter (Mimi So billing memo dated December 13, 2007); and a Mimi So revenue summary dated May 1, 2008; Ex. D to

Crosby Jan. 11, 2008 Decl. (Mimi So revenue summary dated May 1, 2008).

27. Richardson Apr. 2, 2008 Decl. ¶ 4.

28. Richardson also noted that despite Mimi So's efforts to reflect differences between pieces of jewelry that share many common characteristics in the U# C, it is possible for two pieces of jewelry with the same item number (including the same U# C) to differ in subtle respects because one of them may have been altered or customized for a particular customer at the customer's request. (*Id.* ¶ 6).

29. *See id.* ¶ 10; Ex. 89 to Pl.'s Summ. J. Mots. (Mimi So wholesale sales summaries); Ex. B to Dec. 15, 2009 Anderson Letter (Mimi So Billing Mem., Mar. 8, 2007).

(MSI Revenue Summary dated May 1, 2008)). However, the textual descriptions that Mimi So employed changed over time, so that the same item number might be accompanied by different shorthand descriptions on different documents. (Richardson Apr. 7, 2008 Decl. ¶ 7).

Mimi So's Gate B9 Collection comprises 373 different item numbers. (Richardson Sep. 19, 2008 Decl. ¶ 5). For many of these item numbers, there is no existing photograph of the corresponding piece of jewelry. (*Id.* ¶ 4; Ex. 6 to *id.*).

## B. *Richemont*

Christopher Colfer, Director of Richemont International, and Edwin McQuigg, an executive of Richemont,[30] were appointed to the five-person board of directors of Mimi So International in 2003 as part of Richemont's acquisition of a 40% interest in MSI. *R.F.M.A.S., Inc.,* 619 F.Supp.2d at 49. In 2005 and 2006, Richemont NA extended MSI $4.5 million in loans. *Id.* Daniel Mawicke, the President and CEO of Richemont North America, testified that the relationship between Mimi So and Richemont Holdings I— the Richemont entity that held the investment in Mimi So—was purely financial. (Daniel Mawicke Dep., Jan. 9, 2008, available at Ex. 99 to Pl.'s Summ. J. Mots. ["Mawicke Dep."], at 171–72). Cormac Kinney, a former executive of Mimi So, International, and Ms. So both testified that no Richemont company exerted control over the Mimi So defendants at any point.[31] As of 2007, no Richemont company held any investment in MSI or had any form of partnership with MSI. *R.F.M.A.S., Inc.,* 619 F.Supp.2d at 49.

The only Richemont-affiliated company that ever distributed Mimi So's Gate B9 collection of jewelry was Richemont Japan, a non-party that previously distributed the collection outside of the United States for a period of time. (*See* Daniel Mawicke Decl., Dec. 13, 2007, Docket # 45 ["Mawicke Dec. 13, 2007 Decl."], at ¶ 3).

There is no evidence that any of the Richemont companies that are defendants in this action have possessed exemplars of Mimi So's Gate B9 jewelry at any point since September 2006. During the course of this litigation, Mr. Mawicke submitted a declaration testifying that he had conducted an additional investigation and found no such pieces in the possession, custody, or control of any of the Richemont defendants. (Daniel Mawicke Decl., Dec. 13, 2007, ¶¶ 1–3; *see also* Ex. A to *id.* (photo of ring)). He also reported that he had inquired about Richemont Japan's possession of Mimi So jewelry, and that Richemont Japan had reported that it had a single piece in stock. (*Id.* ¶ 3).

## II. *RELEVANT LEGAL STANDARDS*

Federal common law and various procedural rules governing discovery impose upon litigants a number of obligations regarding the handling and production of evidence. Chief among these obligations is the common-law duty to preserve documents and property that could potentially serve as evidence in a lawsuit. *See West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999). In addition, the Federal Rules of Civil Procedure [32] establish protocols regarding the manner and timing of requesting discovery and responding to discovery requests, and other discovery obligations may arise by way of court order.[33]

---

**30.** Mr. McQuigg testified at his deposition that, from 2001 until his retirement in 2007, although he was physically located in the offices of Richemont North America, he was technically an employee of another Richemont entity that is not a defendant in this case. (*See* Edwin McQuigg Dep., Feb. 20, 2008, at p. 18, available at Ex. 9 to Pl.'s Summ. J. Mot., Docket # 99–100).

**31.** *See* John P. Margiotta, Esq. Decl., Aug. 11, 2008 ["Margiotta Aug. 11, 2008 Decl."] at ¶¶ 10, 14; Cormac Kinney Dep., Jan. 3, 2008, available at Ex. 32 to Margiotta Aug. 11, 2008 Decl. ["Kinney Dep."] at 96–98; Mimi So Dep., Mar. 6,

2008, available at Ex. 36 to Margiotta Aug. 11, 2008 Decl. ["So Dep."] at 232.

**32.** Federal Rules 26 through 37 govern discovery in civil cases. *See Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309, 315 (S.D.N.Y.2003) (*"Zubulake I"*).

**33.** *See, e.g., Wolters Kluwer Fin. Servs., Inc. v. Scivantage,* 564 F.3d 110, 118 (2d Cir.2009) (Fed. R.Civ.P. 37(d) "grants a district court 'broad power' to impose sanctions on a party who disobeys a discovery order.") (internal citation omitted).

■ A district court has broad authority to impose sanctions for violations of discovery obligations, such as the spoliation of evidence or failure to comply in a timely manner with an appropriate discovery request.[34] *See, e.g., Arista Records, LLC v. Usenet.com, Inc.,* 633 F.Supp.2d 124, 138 (S.D.N.Y.2009). A court may also sanction parties for sustained uncooperative conduct during discovery, even if no single act in the uncooperative party's course of conduct would, on its own, warrant sanctions.[35] This power derives from both Rule 37 and the federal courts' inherent supervisory power. *Arista Records, LLC,* 633 F.Supp.2d at 138; *In re NTL, Inc. Sec. Litig.,* 244 F.R.D. 179, 191 (S.D.N.Y. 2007) (internal citation omitted); *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 216 (S.D.N.Y.2003) (*"Zubulake IV"*) (internal citations omitted).[36] Sanctions that the court may impose for discovery violations include—

in ascending order of harshness—an order directing the noncompliant party to provide further discovery; shifting of costs, including attorneys' fees, incurred by the other parties in connection with the discovery violation; imposing fines payable to the court on the culpable party or its attorneys [37]; an instruction informing the jury of the discovery breach; [38] an order precluding the noncompliant party from using particular pieces of evidence that were withheld during discovery in connection with motions or at trial; an order establishing particular facts, issues, claims, or defenses related to the discovery abuse against the noncompliant party [39]; or the entry of a default judgment, dismissal, or declaration of a mistrial ("terminating sanctions"). *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC,* 685 F.Supp.2d 456, 468–70 (S.D.N.Y.

**34.** *See Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 112 (2d Cir.2002) ("District courts should not countenance 'purposeful sluggishness' in discovery on the part of parties or attorneys and should be prepared to impose sanctions when they encounter it.").

**35.** *See Residential Funding Corp.,* 306 F.3d at 113 (stating that even if defendant's untimely production of emails did not warrant sanctions, court should consider whether defendant's general course of resistance to discovery warranted sanctions); *id.* at 112 (observing that "as a discovery deadline or trial date draws near, discovery conduct that might have been considered 'merely' discourteous at an earlier point in the litigation may well breach a party's duties to its opponent and to the court."); *Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422, 436 (*"Zubulake V"*) (same (quoting *id.*)); *Arista Records, LLC,* 633 F.Supp.2d at 141–42 (considering totality of party's discovery conduct, including "evasive discovery tactics" falling short of discovery violations, in deciding an appropriate sanction for spoliation).

**36.** *See also* Fed.R.Civ.P. 37(b) (authorizing sanctions for failure to comply with a discovery order); Fed.R.Civ.P. 37(c) (authorizing sanctions for failure to disclose, supplement disclosures, or admit); Fed.R.Civ.P. 37(d) (authorizing sanctions for failure to attend deposition, answer interrogatories, or respond to a request for inspection); *Chambers v. NASCO, Inc.,* 501 U.S. 32, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (observing that "court's inherent power to police itself" allows it to sanction parties for disrupting or delaying litigation, hampering enforcement of court orders, perpetrating fraud on the court, or other "bad-faith conduct") (internal citations

omitted); *Residential Funding Corp.,* 306 F.3d at 106–07 ("Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs.") (internal citations omitted).

**37.** Although spoliation may be the result of the acts (or failures to act) of either the party itself or its attorneys, ultimately, the party must bear the cost of mistakes made by its attorney in her role as advocate. *See Zubulake V,* 229 F.R.D. at 434 & n. 87 (citing *Metro. Opera Assoc., Inc. v. Local 100,* 212 F.R.D. 178, 222 (S.D.N.Y.2003) (entering default judgment as a result of counsel's failure to instruct clients of their discovery obligations)); *cf. United States v. Seltzer,* 227 F.3d 36, 39–42 (2d Cir.2000) (discussing difference in standards for sanctioning an attorney for violating responsibilities as an officer of the court versus misconduct that is inherently related to attorney's role as advocate for client).

**38.** For example, a sanction for spoliation might take the form of an instruction that the jury may infer from the fact of destruction of certain evidence that the evidence, if available, would have been harmful to the party that destroyed it. *Zubulake V,* 229 F.R.D. at 430 & n. 62 (citing *Byrnie v. Town of Cromwell,* 243 F.3d 93, 107–12 (2d Cir.2001); *Residential Funding Corp.,* 306 F.3d at 107).

**39.** *See, e.g., Arista Records, LLC,* 633 F.Supp.2d at 141–42 (precluding defendant from asserting affirmative defense as sanction for destroying or failing to preserve evidence relevant to that defense "and other evasive discovery tactics").

2010) ("*Zubulake Revisited*"); Fed.R.Civ.P. 37(b)-(f).

### A. Standard for Imposing Sanctions

■ To impose sanctions upon a party for violating a discovery obligation, the court must find that the party acted with a "culpable" state of mind.[40] In the Second Circuit, negligence is sufficient to establish culpability. *Residential Funding Corp.*, 306 F.3d at 108.

■ To impose an adverse inference instruction for discovery abuse involving the spoliation of evidence [41] or failure to timely produce evidence, the court must also find that the evidence destroyed or withheld is "relevant" to another party's claim or defense. *Id.* at 107. In this context, evidence is "relevant" if a reasonable trier of fact could infer that the "destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." *Id.* at 109 (quoting *Kronisch*, 150 F.3d at 127; *Byrnie*, 243 F.3d at 110). When evidence is destroyed intentionally or by gross negligence, that fact alone may constitute sufficient evidence from which a reasonable fact finder could conclude that the with-

held or destroyed evidence was unfavorable to the non-compliant party. *Id.*

### B. Scope of Duty to Preserve Evidence

■ In order to make a finding of spoliation, the court must first determine that the allegedly spoliating party had a duty to preserve the evidence at issue. *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y.1991); *see also Zubulake IV*, 220 F.R.D. at 216 ("It goes without saying that a party can only be sanctioned for destroying evidence if it had a duty to preserve it."). This involves consideration of two related inquiries: when does the duty to preserve evidence attach, and what evidence must be preserved? *Zubulake IV*, 220 F.R.D. at 216.

■ Although a party must of course preserve any evidence requested in discovery,[42] the duty to preserve relevant evidence attaches well before this. The obligation first arises "when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Zubulake IV*, 220 F.R.D. at 216 (quoting *Fujitsu*, 247 F.3d at 436 (internal citations omitted)).

■ Evidence that must be preserved includes documents, electronically stored information,[43] and physical evidence [44] that the

---

40. *See Residential Funding Corp.*, 306 F.3d at 107 (quoting *Byrnie*, 243 F.3d at 107–12) (culpable state of mind required to grant adverse inference instruction for spoliation or failure to timely produce evidence); *Zubulake IV*, 220 F.R.D. at 220 (culpable state of mind required to grant adverse inference instruction or other sanctions for spoliation); *Arista Records, LLC*, 633 F.Supp.2d at 138 ("The degree of culpability bears on the severity of sanctions that are warranted. Severe sanctions for discovery violations, including dismissal, may be imposed for intentional conduct, such as bad faith or gross negligence." (quoting *Reino De Espana v. American Bureau of Shipping*, 2007 WL 1686327, *3 (S.D.N.Y. June 6, 2007))).

41. "Spoliation of evidence" is defined as "the destruction or significant alteration of evidence or the failure to preserve the property for another's use as evidence in pending or reasonably foreseeable litigation". *West*, 167 F.3d at 779.

42. *Turner*, 142 F.R.D. at 72 (quoting *Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 593 F.Supp. 1443, 1455 (C.D.Cal.1984)).

43. *See generally Zubulake IV*, 220 F.R.D. 212 (discussing scope of duty to preserve electronic

documents and consequences of failure to preserve them). The obligation to preserve transitory electronic data is substantially more limited, however. *See Arista Records, LLC*, 633 F.Supp.2d at 140 ("Unlike the Usage Data and Digital Music Files that Magistrate Judge Katz considered in his Sanctions Order, the data alleged to have been despoiled here was not transitory in nature; rather, it was the sort of data-internal reports, email communication, and the like-that are clearly subject to a preservation obligation.").

44. *E.g., West*, 167 F.3d at 778–79 (plaintiff's sale of tire changing machine and air compressor that defendants contended contributed to plaintiff's injuries constitutes spoliation); *Donini Int'l, SPA v. Satec (USA), LLC*, 2006 WL 695546, *8 (S.D.N.Y. Mar.16, 2006) (stating that duty to preserve evidence extends to "artifacts"); *Peyser v. Searle Blatt & Co.*, 2000 WL 1071804, *8 (S.D.N.Y. Aug.2, 2000) (duty to preserve exemplar of allegedly infringing sweater); *Indemnity Ins. Co. of North America v. Liebert Corp.*, 1998 WL 363834, *4 (S.D.N.Y. June 29, 1998) (duty to preserve allegedly defective equipment).

party knows or reasonably should know is relevant to claims or defenses in the action, is reasonably calculated to lead to the discovery of admissible evidence, or is reasonably likely to be requested during discovery. *Turner,* 142 F.R.D. at 72 (quoting *Wm. T. Thompson Co.,* 593 F.Supp. at 1455). The Federal Rules of Civil Procedure make parties responsible not only for evidence in their immediate possession, but also evidence within their "control". Fed.R.Civ.P. 34(a)(1); *Leser v. U.S. Bank Nat. Ass'n,* 2010 WL 1945806, *1 (E.D.N.Y. May 13, 2010). Evidence in a party's "control" has been interpreted to mean evidence that the party has the legal right, authority, or practical ability to obtain by virtue of its relationship with the party in possession of the evidence. *Leser,* 2010 WL 1945806 at *1; *Bank of N.Y. v. Meridien BIAO Bank of Tanzania Ltd.,* 171 F.R.D. 135, 146–7 (S.D.N.Y.1997); *Golden Trade, S.r.L. v. Lee Apparel Co.,* 143 F.R.D. 514, 525 (S.D.N.Y.1992).

 To fulfill this preservation obligation, a litigant must take affirmative steps to prevent inadvertent spoliation. At the outset of the litigation, each party must identify all sources of potentially relevant evidence and implement a "litigation hold" suspending any routine document destruction or other processes involved in the ordinary course of business that might result in the destruction of potentially relevant evidence. *See Zubulake IV,* 220 F.R.D. at 218; *Zubulake V,* 229 F.R.D. at 432. The duty to preserve evidence is an ongoing duty. *Zubulake V,* 229 F.R.D. at 433 & n. 79 (internal citation omitted). Thus, the party—and its counsel—must monitor the party's compliance with the litigation hold, ensuring that all relevant actors understand the policy and are implementing it faithfully. *Id.* at 432.

### C. Selecting an Appropriate Sanction

 A district court has broad discretion to determine an appropriate sanction for discovery violations based on the facts of the particular case. *Residential Funding Corp.,* 306 F.3d at 101; *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423, 436 (2d Cir.2001) (internal citations omitted); *Arista Records, LLC,* 633 F.Supp.2d at 141 (citing *West,* 167 F.3d at 779–80; *Fujitsu Ltd.,* 247 F.3d at 436). An appropriate sanction is one that will: (1) deter parties from violating discovery obligations; (2) place the risk of an erroneous judgment on the party that wrongfully created the risk; and (3) restore the prejudiced party to the same position that it would have been in absent the discovery violation by an opposing party. *West,* 167 F.3d at 779 (quoting *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998)). A court should always impose the least harsh sanction that will accomplish these goals. *Passlogix, Inc. v. 2FA Tech. LLC,* 708 F.Supp.2d 378, 420–21, 2010 WL 1702216, at *35 (S.D.N.Y.2010) (citing *Zubulake Revisited,* 685 F.Supp.2d at 468–70).

Thus, how severe a sanction is warranted will depend on the extent of the discovered party's non-compliance with discovery obligations, the degree of that party's culpability, and the extent to which the non-compliance prejudiced the other parties. A strong showing of one of these factors may warrant sanctions even where the other two factors are weak or absent. For example, particularly serious discovery violations, such as the spoliation of highly relevant evidence, may warrant harsh sanctions even if the violation was merely negligent. *See Residential Funding Corp.,* 306 F.3d at 108 ("The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence." (citing *Turner v. Hudson Transit Lines,* 142 F.R.D. 68, 75 (S.D.N.Y.1991); *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir. 1998))).

 Although the court may impose sanctions even if the discovery violation did not prejudice the other parties, the absence of prejudice generally militates toward the imposition of a less harsh sanction. *See Passlogix, Inc.,* 708 F.Supp.2d at 421, 2010 WL 1702216, at *36 ("Preclusion is a harsh sanction preserved for exceptional cases where a [ ... ] party's failure to provide the requested discovery results in prejudice to the requesting party." (quoting *Tracy v. NVR, Inc.,* 2009 WL 3153150, at *8 n. 15 (W.D.N.Y. Sep. 30, 2009))). The noncompliant party bears the burden to demonstrate that the

other parties did not suffer any prejudice from the spoliation. *Zubulake Revisited*, 685 F.Supp.2d at 467–68. Where the discovery violation involves spoliation or withholding of evidence, the absence of prejudice can be shown by demonstrating, for example, that the other parties were able to obtain the same evidence from another source,[45] or that during discovery they never asked for the evidence later shown to have been spoliated.[46]

A terminating sanction "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *West*, 167 F.3d at 779 (internal quotations omitted); *Arista Records, LLC*, 633 F.Supp.2d at 141 (quoting *West*, 167 F.3d at 779). Circumstances in which a terminating sanction may be warranted include "egregious cases, such as where a party has engaged in perjury, tampering with evidence, or intentionally destroying evidence". *Zubulake Revisited*, 685 F.Supp.2d at 468–70 (citing *West*, 167 F.3d at 779).

### III. ALLEGED SPOLIATION OF EXEMPLARS OF KEY PIECES OF GATE B9 JEWELRY

Plaintiff accuses all defendants of having spoliated exemplars of the key "large-link" Gate B9 necklace and bracelet. This claim is premised on allegations that defendants had these "key pieces" of jewelry in their custody or control at various times between November 2006 and June 2009, but either sold all of them or disassembled them and reused the parts so that they could not produce exemplars of these pieces for inspection when requested by plaintiff during discovery.[47]

Plaintiff further alleges that defendants misrepresented to plaintiff and the court the facts concerning their possession of such exemplars,[48] and made exemplars available to their own experts while claiming not to have any exemplars to show plaintiff's experts. (*E.g., id.*).

It is undisputed that defendants never produced to plaintiff during discovery exemplars of the large-link necklace identified by item number B9NGYG0000627 or the large-link bracelet identified by item number B9BGYG0010775. It is also undisputed that on several occasions in November and December 2007, defendants represented to plaintiff or to the court that they had no exemplars of these pieces in their custody or control. The undisputed evidence also shows that Mimi So International shipped large-link pieces on several occasions in 2006, 2007, and 2008.

Defendants argue that if plaintiff wanted to prevent Mimi So from selling these pieces during the course of litigation, it was incumbent upon plaintiff to obtain an injunction.[49] The Richemont defendants also argue that plaintiff improperly lumps all defendants together in its charges of spoliation, and that the Richemont defendants did not have any jewelry exemplars in their possession, custody, or control.[50]

#### A. Allegations and Findings of Fact Regarding Mimi So Defendants' Possession of Key Large–Link Pieces

##### 1. Evidence of Shipments of Key Pieces in 2006, 2007, and 2008

Mimi So documents reflect, between the commencement of this action and February

---

**45.** See *Passlogix, Inc.*, 708 F.Supp.2d at 417, 2010 WL 1702216, at *32 (citing *Zubulake Revisited*, 685 F.Supp.2d at 467–68; *Ispat Inland, Inc. v. Kemper Envtl., Ltd.*, 2006 WL 3478339, at *3 (S.D.N.Y. Nov.30, 2006)).

**46.** See, e.g., *Klezmer ex rel. Desyatnik v. Buynak*, 227 F.R.D. 43, 52 (E.D.N.Y.2005) (declining to give adverse inference jury instruction for spoliation of evidence where movant failed to seek the evidence during discovery) (collecting cases).

**47.** *E.g.*, Pl.'s Mem. Law Supp. Summ. J. Mot. Agst. Mimi So, at 9 (stating that large-link pieces were "destroyed, sold, or lost"); *id.* at 11 (stating that "the actual large link Gate B9 pieces appear gone" but citing nothing); *id.* ("Defendants here

destroyed, disassembled, or otherwise lost 'the very item this lawsuit is over' ") (internal citation omitted).

**48.** See, e.g., Pl.'s Dec. 15, 2009 Letter at 2.

**49.** Defs.' Jan. 14, 2010 Mem. at 3; *see also* Mimi So Defs.' Mem. Law Opp. Summ. J. Mot. at 9 (arguing that Mimi So had no obligation to stop selling all Gate B9 jewelry as soon as it was on notice of litigation, which would be equivalent to granting plaintiff a pre-suit preliminary injunction).

**50.** *E.g.*, Richemont Defs.' R. 56.1 Counter–Statement, at passim.

2008, twenty-two shipments of jewelry from Mimi So International that contain the large-link necklace identified by item number B9NGYG0000627,[51] the large-link bracelet identified by item number B9BGYG0010775,[52] or both.[53] Other large-link necklaces with item numbers B9NGRY0010718, B9NGYG0010718, and B9NGRY0000718 were included in shipments on November 16, 2006, March 8, 2007, and June 15, 2007.[54] These necklaces appear to be similar in many-respects to the so-called "key large-link necklace" (B9NGYG0000627) in that they are chains of multifaceted links, and appear to use the same three sizes of links.[55] However, the B9NGRY0010718, B9NGYG0010718, and B9NGRY0000718 necklaces are much shorter (18 inches rather than 27) and the medium and large links on the B9NGYG0010718 and B9NGRY0010718 necklaces are dotted with diamonds. (See id.). Although plaintiff places primary emphasis on defendants' withholding of the B9NGYG0000627 necklace, we infer from plaintiff's submissions that defendants also never produced these other large-link necklaces for inspection by plaintiff.

Plaintiff places particular emphasis on the March 8, 2007 shipment of two large-link necklaces with the item numbers B9NGYG0000627 and B9NGYG0010718 to the Fross, Zelnick, Lehrman & Zissu law firm, which represented all defendants until June 27, 2007, and thereafter represented the Richemont defendants. (Pl.'s Dec. 15,

2009 Letter at 2; Ex. B to Pl.'s Dec. 15, 2009 Letter). Defendants do not deny that Mimi So's attorneys brought a large-link necklace to a pre-trial conference before Judge Marrero on March 9, 2007. In an email exchange between defendants' counsel and plaintiff's counsel dated June 18, 2008, which plaintiff also cites (see id.), defendants confirmed that the pieces reflected in the memo were returned to Mimi So International on or around March 9, 2007. (Id.).[56] When plaintiff's counsel replied by email to inquire about the present status of these pieces and what they looked like, defendants' counsel responded, "What we had in our possession for one day in 2007 is not relevant to any of your client's claims, and we are not willing to waste more time and money corresponding with you on irrelevant claims." (Id.).

The parties were originally scheduled to meet on November 26, 2007 to inspect and photograph each other's jewelry exemplars. However, that day plaintiff requested that the inspection be postponed until after document production. The court ordered that the inspection and photographing take place on December 4, 2007. (Order, Nov. 30, 2007).

The meeting took place on December 4 as directed, but defendant did not produce all of the allegedly infringing Gate B9 jewelry pictured in the photographs attached to the complaint. (See Pl.'s Dec. 15, 2009 Letter at 2; Steven M. Crosby, Esq. Letter to the Court, Dec. 5, 2007). Specifically, defendants

---

51. See Ex. D to Crosby Jan. 15, 2010 Decl. (see both memos dated Nov. 28, 2006 and memos dated Dec. 5, 2006; Dec. 19, 2006; Dec. 28, 2006; Jan. 5, 2007; Jan. 11, 2007; Jan. 29, 2007; Feb. 12, 2007; Feb. 15, 2007; Mar. 8, 2007; Mar. 30, 2007; Apr. 26, 2007; June 15, 2007; and Dec. 13, 2007); Ex. 122 to Pl.'s Summ. J. Mots. (invoice dated Dec. 20, 2007).

52. See Ex. D to Crosby Jan. 15, 2010 Decl. (memos dated Nov. 16, 2006; Dec. 12, 2007; Dec. 17, 2007; Feb. 4, 2008; and Feb. 18, 2008).

53. See Ex. D to Crosby Jan. 15, 2010 Decl. (memo dated July 30, 2007).

54. See Ex. D to Crosby Jan. 15, 2010 Decl. (memos dated Nov. 16, 2005; Mar. 8, 2007; June 15, 2007).

55. See Ex. E to Pl.'s Dec. 15, 2009 Letter (photos of B9NGRY0010718 and B9NGRY0000718). Although there does not appear to be a photograph

of the B9NGYG0010718 necklace, we infer from the parties' representations that it is substantially the same as the B9NGRY0010718 necklace except that it uses a different kind of gold—namely, yellow gold, the same type of gold employed in the "key large-link necklace" (B9NGYG0000627). (See, e.g., Richardson Apr. 2, 2008 Decl. ¶ 4).

56. In this email, John Margiotta, Esq. actually states that the necklaces "were returned to Mimi So International on or around March 9, 2008." Id. Because of Margiotta's later reference in that email thread to counsel having possessed the pieces "for one day in 2007", id., we infer that "2008" was a typographical error and that he meant to convey that they were returned on March 9, 2007, the day after they were sent to the Fross Zelnick firm, rather than one year later.

did not produce the large-link bracelet or necklace depicted in the Neiman Marcus ad appended to the complaint, although they did produce a pair of the large-link earrings featured in the complaint. (*See* Richardson Dec. 14, 2007 Decl. ¶¶ 6, 8).[57]

The next day, plaintiffs wrote to the court requesting that the court "compel Defendants to produce all the correct pieces requested and identified in our Demand Letter and Complaint-all the correct pieces in Defendants' Gate B9 Collection as depicted in its catalog and website." (Steven M. Crosby, Esq. Letter to the Court, Dec. 5, 2007). Two days later, in a letter to the court, counsel for Mimi So represented that it had made available for inspection by plaintiff all items from the Gate B9 collection in the possession, custody, or control of defendants. (Barry G. Magidoff, Esq. Letter to the Court, Dec. 7, 2007). He added:

> Many of the pictures referred to by plaintiff involve either early prototypes, which have been sold (or possibly taken apart and the parts reused), or were hand-made pieces, made to order, which were then sold. In either case, they are not presently available (and were not available on Tuesday) to defendants.

(*Id.*). I entered the following order:

> In view of the representations of Mimi So's counsel, it appears that defendant does not have representative samples of the items sought by plaintiff. If that is so, defendant is to provide an affidavit by a person with personal knowledge to attest to that asserted fact, and is to do so by no later than December 14, 2007. The parties are

to proceed with the balance of discovery as previously directed.

(Endorsed Order, Dec. 10, 2007).

On December 14, 2007, William Richardson of Mimi So International executed a sworn affidavit in which he stated, in relevant part:

> In my capacity [as] Chief Financial Officer, I searched the premises of International, in accordance with the order of this court to produce representative samples, of all the then currently available inventory items from the Gate B–9 Collection, at the offices of plaintiff's counsel, the afternoon of December 4, 2007. I reviewed all of these items of Gate B–9 jewelry, and asked Mimi So if she had any other such items in her personal possession; and she responded she had none. [ . . . . ] [T]he necklaces shown in the Neiman Marcus ad were not then available on Tuesday, December 4, 2007, to either defendant. [ . . . . ] Thus, the Mimi So defendants had brought samples of all of the then available items to the photo shoot and could not have brought any other items.

(Richardson Dec. 14, 2007 Decl. ¶¶ 3, 8, 11).

According to Mimi So billing memos, on December 12 and 17, 2007 and twice in February 2008, MSI shipped large-link bracelets,[58]and on December 13 and 20, 2007, Mimi So shipped large-link necklaces.[59] In response to this evidence that Mimi So shipped several of the disputed pieces of jewelry after claiming it did not have such pieces in its possession,[60] defendants proffered Ms. So's testimony that, to the best of her recollection, they had stopped manufacturing the large-link necklace prior to December 2007, and did not have any in stock on December 13, 2007. (Mimi So Decl., Jan. 14, 2010,

---

57. On summary judgment, Mimi So also contended that at the December 4, 2007 meeting, it produced two other necklaces that contained a single link the same size as the largest individual link in the so-called "large-link necklace". (Mimi So Defs.' R. 56.1 Counter–Statement (filed under seal at Docket # 114), at ¶ 26). This description matches the other of the two Mimi So necklaces pictured in the exhibits to the complaint that identify the allegedly infringing works. (*See* Ex. C to Compl.). Plaintiff complains only of one of the infringing necklaces being withheld; we thus infer that defendants produced the other for inspection.

58. *See* Ex. B to Pl.'s Dec. 15, 2009 Letter (billing memos dated Dec. 12, 2007; Dec. 13, 2007; Dec. 17, 2007).

59. *See* Ex. B to Pl.'s Dec. 15, 2009 Letter (billing memo dated Dec. 13, 2007); Ex. 122 to Pl.'s Summ. J. Mots. (invoice dated Dec. 20, 2007).

60. *See* Pl.'s Dec. 30, 2009 Letter at 2; Ex. A to Pl.'s Dec. 30, 2009 Letter (noting discrepancy between shipments of large-link pieces and statements of counsel in December 2007).

Docket # 204, at ¶ 2). Defendants offer no other explanation for the December 2007 Mimi So billing memos. (*See* Defs.' Dec. 21, 2009 Letter at 1).

### 2. *Alleged Possession by Expert Witnesses in 2008 and 2009*

Plaintiff claims that defendants made exemplars of the key large-link pieces available to two of their expert witnesses—Mr. Lent and Ms. Kelly—in early 2008 and June 2009, respectively. On August 31, 2009, the Mimi So defendants produced jewelry for inspection by plaintiff's expert witnesses. (*E.g.*, Pl.'s Dec. 15, 2009 Letter at 2). The large-link necklace and bracelet were not among the pieces that they made available.[61] Defendants deny that their expert witnesses saw these pieces. (Defs.' Dec. 21, 2009 Letter at 2–4).

### (a) *Mr. Lent*

Plaintiff supports its assertion that Mr. Lent examined exemplars of the key pieces in early 2008 by citing his deposition, which it reports was taken on November 9, 2009.[62] According to plaintiff, Mr. Lent testified in part as follows:

Q: You've actually held in your hands the Mimi So jewelry that has been accused of infringing upon the jewelry of RFMAS?

A: Yes, I have.

Q: And on what occasion was that?

A. When I was retained-or when hired, I went to several stores that handle Mimi So, and I went to several stores that handle Faraone Mennella.

Q: And what stores were those?

A: Saks and Mimi So's store.

Q: And what stores did you go to to view the RFMAS—

A: Saks.

(Pl.'s Dec. 30, 2009 Letter at 2 n. 2 (citing Lent Dep. at 20)). Plaintiff added that Lent said that he was retained as an expert "about a year and a half ago. Possibly a little bit longer." (*Id.* (citing Lent Dep. at 14)). Plaintiff noted that it is undisputed that Mimi So did not sell the allegedly infringing pieces at Saks, implying that if Lent's testimony is accurate and complete, then he must have held the key pieces at Mimi So's store some time around March 2008. (*See id.*).

### (b) *Ms. Kelly*

In support of its claim that in June 2009, defendants showed samples of these key large-link pieces to Ms. Carolyn Kelly, who they retained as an expert witness (Pl.'s Dec. 15, 2009 Letter at 2), plaintiff cites an excerpt of her deposition that it construes as an admission that she saw the large-link necklace at the office of counsel for the Richemont defendants. (*Id.*; Ex. E. to *id.*). Defendants contest this, and proffer the declaration of Mimi So, who testified that she brought the medium-link necklace and bracelet, not the large-link necklace and bracelet, to the meeting with Ms. Kelly. (Mimi So Decl., Jan. 14, 2010, Docket # 204, at ¶ 1). Defendants also argue that plaintiff twisted the substance of Ms. Kelly's deposition, and they provide additional portions of the deposition transcript to demonstrate that Ms. Kelly equivocated when pressed by plaintiff's counsel as to whether or not the large-link necklace was the one that she was shown in June 2009. As defendants point out, plaintiff's counsel showed Ms. Kelly many photos of large-link pieces in the Gate B9 collection, but no photos of the medium-link pieces,

61. *Id.* ("When MSI produced its pieces for Plaintiff's experts, on August 31, 2009, the actual large link necklace and bracelet were not produced (Exhibit F)."). The exhibit to which plaintiff refers in this statement is an unlabeled, unexplained photograph of what appear to be four Mimi So Gate B9 necklaces (including a medium-link necklace), a Gate B9 medium-link bracelet with diamonds, and a pair of Gate B9 large-link earrings. (*See* Ex. F to Pl.'s Dec. 15, 2009 Letter). We infer that this is a photo of the pieces that defendants produced for inspection by plaintiff's experts. It appears that defendants produced a medium-link necklace and bracelet

rather than a large-link necklace or bracelet, but that they produced the other two allegedly infringing Gate B9 pieces (a pair of earrings and a necklace). (*Compare* Ex. F to Pl.'s Dec. 15, 2009 Letter *with* Ex. C to Compl.).

62. Plaintiff did not provide the court with the actual deposition transcript, either in whole or in part. However, plaintiff's motion papers quoted portions of the deposition, and defendants do not challenge the accuracy of plaintiff's transcription.

which looks similar to the large-link necklace at issue in this motion, and which Ms. So testified were the pieces that she showed to Ms. Kelly. (*See* Defs.' Dec. 21, 2009 Letter at 2). The relevant testimony proffered by the parties is as follows.

During the following portion of plaintiff's examination of Ms. Kelly, plaintiff's counsel was apparently referring to an image of a large-link necklace.[63]

Q: Now, directing your attention to panel third from the right, did the necklace that you saw look like the necklace depicted in the third panel from the right?

A: I believe it was slightly different.

Q: In what way?

A: This oval looks bigger than the one I saw. I believe that. It was a few months ago.

Q: Right. Okay. Is there any way for someone reviewing your report to determine exactly what pieces you saw?

A: You have to get the pieces that Mimi brought. [ ... ]

[ ... ]

Q: So we basically don't know exactly what pieces you looked at, do we?

A: No.

(Carolyn M. Kelly Dep. at 212–213, available at Ex. E to Pl.'s Dec. 15, 2009 Letter & Ex. 2 to Defs.' Dec. 21, 2009 Letter).

During the next portion of relevant testimony, Ms. Kelly was shown twelve numbered photographs of various large-link pieces and asked whether she had seen any of those pieces.[64]

Q: Just go through each, or you can tell me which one you saw, or you can go through each page?

A: What I saw in their office or have seen in life?

Q: Okay. Why don't you tell me both.

[ ... ]

A: I have to come back to 2. No. 3 I did see in their office.

Q: Okay.

A: Or actually it was No. 4, not 3. It's No. 4 that I saw.

Q: What about 3, did you ever see that?

A: No. I saw it with the diamond.

Q: You saw No. 3 with the diamond?

A: Which is No. 4.

[ ... ]

A: [ ... ] No. 8, 9, 10 and No. 12 are the same necklace. And I did see the one with the diamonds, which would be No. 12, No. 9 and No. 10. They are all the same.

Q: So you saw 12, 9, and 10 where?

A: Mimi had that.

Q: So at John Margiotta's office?

A: Yes. [ ... ]

(Carolyn M. Kelly Dep. at 214–16, Ex. E to Pl.'s Dec. 15, 2009 Letter). Later in the deposition, plaintiff's counsel asked Ms. Kelly to return to number 2, the large-link necklace that bears item number B9NGYG0000627.

Q: In Exhibit 3 Page 2, you had said you'd come back to that. [ ... ] Look at Page 2.

A: [ ... ] I saw what is No. 12, No. 10, No. 9, 8, and 2. I saw 6, 7 and 11. And I saw a 3 and 4, but I saw it with a diamond, and you're saying it doesn't matter because of the design shape. [ ... ]

Q: But you saw No. 2 and—

MR. LEHV: She did it already in a different order.

Q: Right. She did it very fast, though. Can you read it back to me. Do it slow. I'm tired. I've had a long day.

---

63. Defs.' Dec. 21, 2009 Letter, at 2. Plaintiff does not dispute this.

64. Number 2 is the large-link necklace that bears item number B9NGYG0000627. (*See* Ex. E to Pl.'s Dec. 15, 2009 Letter). Number 3 is a large-link bracelet without diamonds. (*See id.*). Number 4 is a large-link bracelet with diamonds bearing item number B9BGRG0010775. (*See* *id.*). Number 8 is an 18–inch large-link necklace without diamonds; number 9 is an 18–inch large-link necklace with diamonds. (*See id.*). Numbers 10 and 12 are large-link necklaces of unspecified length, with diamonds; neither is labeled with an item number and the photo of number 12 is cropped so that it is impossible to tell how long the necklace is. (*See id.*).

A: You? I never saw anything more ridiculous in my [life]. No. 2, No. 8, No. 9, No. 10, and No. 12 would all be the same necklace.

Q: You [saw that]?

A: I saw it.

Q: At John Margiotta's office?

A: John's office.

(Carolyn M. Kelly Dep. at 220–22, available at Ex. E to Pl.'s Dec. 15, 2009 Letter). Immediately after this exchange, plaintiff's counsel showed Ms. Kelly a full-page photograph of the large-link necklace (marked at the deposition as Exhibit 4). (Defs.' Dec. 21, 2009 Letter at 2; *see also* Ex. 3 to Defs.' Dec. 21, 2009 Letter).

(Whereupon, Exhibit No. 4 was marked for identification.)

Q: Take a look at 4.

A: Okay.

Q: Did you see that necklace?

A: I told you I saw one that had diamond[s].

Q: But did—so you saw this necklace with diamonds?

A: I believe so. I don't know. I saw a necklace with diamonds.

Q: So you can't tell if you actually saw this or not separate and apart from the diamonds?

A: No, I can't tell.

Q: Okay. Now when you answered about Exhibit 3—okay. We went through that.

MR. FELDMAN: I think we're done. We're done.

(Carolyn M. Kelly Dep. at 222, available at Ex. E to Pl.'s Dec. 15, 2009 Letter).

### 3. *Findings of Fact*

It is plain from this record that defendants shipped large-link necklaces or bracelets on November 16, 2006; November 28, 2006; December 5, 2006; December 19, 2006; December 28, 2006; January 5, 2007; January 11, 2007; January 29, 2007; February 12, 2007; February 15, 2007; March 8, 2007; March 30, 2007; April 26, 2007; June 15, 2007; July 30, 2007; December 12, 2007; December 13, 2007; December 17, 2007; February 4, 2008; and February 18, 2008. However, the excerpts provided to the court of the depositions of Mr. Lent and Ms. Kelly do not substantiate plaintiff's claims that defendants provided these experts with access to the key pieces of jewelry.

Defendants have not given us any reason to doubt the accuracy of the Mimi So documents reflecting shipments of the large-link pieces. They seem to concede the accuracy of the documents reflecting shipments between November 2006 and July 2007. With respect to the December 2007 shipments, Ms. So's January 2010 declaration is not sufficient to call the documentary evidence into question. Defendants have not identified the person responsible for preparing the billing memos or made any other attempt to explain the evidence that conflicts with Ms. So's recollection. Even if we assume that Ms. So would have had full knowledge of precisely what pieces were being manufactured at any given time, and even if we further assume the accuracy of her "recollection" in 2010 that the company discontinued manufacture of the large-link necklace almost three years earlier, her testimony still does not dispel the possibility that, at some point, a vendor returned unsold large-link pieces to Mimi So which the company shipped out again in December 2007. Indeed, Ms. So asserted that, occasionally, pieces previously delivered to third-party vendors for sale on consignment would be returned unsold to Mimi So, in which case Mimi So would "try to sell the item immediately through another retailer".[65]

As for plaintiff's assertion that defendants showed the large-link pieces to their experts, neither Mr. Lent's testimony nor Ms. Kelly's demonstrates that either of them handled those pieces. Plaintiff urges that Mr. Lent testified that he held the key pieces in Mimi So's store in early 2008, but plaintiff's interpretation of his testimony relies on unfound-

---

65. Mimi So Decl., Jan. 14, 2010, Docket # 204, at ¶ 4; *see also* Mimi So Defs.' R. 56.1 Counter–Statement (under seal at Docket # 114), at ¶ 47 (noting that pieces submitted to Neiman Marcus for sale on consignment "in many cases were returned by Neiman Marcus if they were not sold").

ed assumptions. Most importantly, plaintiff's interpretation assumes that Mr. Lent understood plaintiff's counsel's question about whether he had handled "the Mimi So jewelry that has been accused of infringing upon the jewelry of RFMAS" as a reference to the so-called "large-link" pieces, rather than to the Gate B9 collection generally. We have no reason to make such an assumption.

Likewise, Ms. Kelly's testimony is not sufficient to allow the court to conclude that she handled the large-link pieces. When first shown a picture of a large-link necklace and asked whether she had seen it, she responded that she believed that she had seen one that was slightly different, noting that one of the links in the large-link necklace "looks bigger than the one I saw." (Kelly Dep. at 212). She also expressed doubt as to the accuracy of her memory, adding, "It was a few months ago." (*Id.*). When Ms. Kelly urged plaintiff's counsel to find out which pieces Ms. So brought to the meeting (*id.*), counsel underscored the minimal value that her testimony would have as an accurate representation of which pieces she had been shown, asking, "So we basically don't know exactly what pieces you looked at, do we?", to which Ms. Kelly responded, "No." (*Id.* at 213).

Despite the apparent futility of trying to get Ms. Kelly to conclusively determine whether or not she had seen the precise pieces depicted in the photos, plaintiff's counsel persevered in this line of questioning. Although it might have been helpful for counsel to show Ms. Kelly photos of the large-link and medium-link pieces side by side to get her to clarify which one she had been shown, he elected never to show her any photographs of the pieces that defendants contend she actually saw. Given Ms. Kelly's foundational testimony and plaintiff's questionable strategic choices during her deposition, it does not help plaintiff that she later seemed to contradict her earlier testimony by indicating that she may have seen some of the large-link pieces. This suggests to the court not that she actually saw the large-link

pieces, but that plaintiff's counsel wore her down by doggedly repeating the same line of questioning until Ms. Kelly provided the answer that plaintiff wanted. At any rate, ultimately, Ms. Kelly returned to her initial position, stating that she simply could not tell whether or not she had seen the large-link necklace or a different one that looked similar. (*Id.* at 222).

In sum, the totality of Ms. Kelly's testimony at her deposition is consistent with the extrinsic evidence that she saw the medium-link pieces rather than the large-link pieces.

Having determined that, on several occasions, the Mimi So defendants rid themselves of the sole exemplars of large-link necklaces and bracelets in their possession, we must next consider whether this violated their duty to preserve evidence. *See Turner*, 142 F.R.D. at 72; *Zubulake IV*, 220 F.R.D. at 216.

### B. *Scope of Defendants' Duty to Preserve Jewelry Exemplars*

Plaintiff argues that the withheld jewelry exemplars constituted highly relevant evidence in this case—indeed, the central evidence of infringement-and that defendants committed spoliation by shipping the only exemplars of those pieces.

▌ Defendants do not seriously question the relevance of the exemplars. However, they question whether the jewelry pieces are "evidence" subject to the preservation obligation.[66] They note that the cases plaintiff cites discuss this duty with respect to paper records and electronically stored information. (Defs.' Jan. 14, 2010 Mem. at 3). According to defendants, if plaintiff wanted to prevent Mimi So from selling its expensive Gate B9 pieces, it was incumbent upon plaintiff to move for a preliminary injunction seeking this relief. (*Id.*). Plaintiff asserts that the "obligation to preserve evidence is not limited to paper or electronic matter." (Pl.'s Jan. 15, 2010 Letter, at 1).

---

66. Defs.' Jan. 14, 2010 Mem. at 3 ("Plaintiff cites no case holding that a defendant has an obligation to retain and not sell samples of a collection of jewelry that includes dozens of items worth in the aggregate hundreds of thousands of dollars.").

### 1. *The Duty to Preserve Evidence Extends to Jewelry for Sale.*

Neither party has pointed to any case law addressing the limitations, if any, on the kinds of evidence that might be subject to the litigation-hold rule. Defendants cite nothing for the proposition that plaintiff was required to obtain a preliminary injunction to prevent defendants from selling some or all Gate B9 jewelry,[67] and plaintiff cites no case recognizing that the duty to preserve evidence extends to non-documentary evidence, much less to expensive saleable goods.[68]

There appears to be a dearth of case law considering whether the sale of a made-to-order luxury good alleged to infringe on another's intellectual property constitutes "spoliation". However, the answer to this question follows from well-established discovery principles.

Although the key cases describing the litigation-hold rule discuss it in the context of preservation of documents and electronically stored information, it is clear that a party's duty to preserve relevant evidence extends to other tangible evidence. (*See supra,* at 23 & n. 44). It is also clear that destroying evidence is not the only way to spoliate it. The cases that defendants cite in support of their contention that "the normal sale of one or more items does not, in and of itself, consti-

tute spoliation"[69] are wholly inapposite.[70] Courts in this circuit have sanctioned parties for spoliation of evidence where they returned it to a store,[71] gave it away as a gift,[72] or, indeed, sold it.[73] In *West,* the plaintiff, an auto mechanic, sued the manufacturer of a tire that exploded as he tried to mount it on a rim. *Id.* at 778. During the course of litigation, Mr. West sold his tire-mounting equipment before defendants had an opportunity to inspect it. *Id.* The district court held that this was sanctionable spoliation, and the Second Circuit agreed. *Id.* at 779. Although Mr. West was not a retailer of tire-changing machines, whereas Mimi So's business centers on the sale of jewelry, defendants offer no reason why the rule that the sale of relevant evidence constitutes a form of spoliation should not apply in this case.

This case does not raise the question of whether the duty to preserve evidence could ever obligate a manufacturer or retailer to stop selling all of its inventory. Plaintiff does not argue that Mimi So was obligated to stop selling all pieces of Gate B9 jewelry or even all exemplars of the four "key" B9 pieces; indeed, we doubt whether plaintiff could learn or prove anything from examining multiple samples of the same item that it could not learn or prove from just one sample.[74] The question before us is simply

67. Defs.' Jan. 14, 2010 Mem. at 3 (stating, without any supporting citations, that "plaintiff never moved for a preliminary injunction, which would be the appropriate vehicle to prevent a party from selling its goods.").

68. Pl.'s Jan. 15, 2010 Letter at 1 (stating, without any supporting citations, that "[t]he obligation to preserve evidence is not limited to paper or electronic matter."); *see also* Defs.' Jan. 14, 2010 Mem. at 3 ("Plaintiff cites no case holding that a defendant has an obligation to retain and not sell samples of a collection of jewelry that includes dozens of items worth in the aggregate hundreds of thousands of dollars.").

69. Mimi So Defs.' Mem. Law Opp. Pl.'s Summ. J. Mot. at 9 (citing *Bolling v. Montgomery Ward & Co.,* 930 F.Supp. 234 (W.D.Va.1996); *Brewer v. Quaker State,* 72 F.3d 326, 334 (3d Cir.1995)).

70. *See Bolling,* 930 F.Supp. at 236–38 (declining to sanction party for sale of evidence by a non-party, where the party against whom sanctions were sought was not involved in decision to sell); *Brewer,* 72 F.3d at 334 (holding that district

court did not err in declining to give adverse inference instruction based on defendant's inability to locate personnel file apparently lost by defendant's deceased in-house counsel).

71. *Peyser,* 2000 WL 1071804, at *8.

72. *Arista Records,* 633 F.Supp.2d at 136, 139–40.

73. *West,* 167 F.3d at 778–79.

74. *See Zubulake IV,* 220 F.R.D. at 218 (stating that duty to preserve evidence does not require a party to retain multiple identical copies of a document); *Warnick v. NMC–Wollard, Inc.,* 512 F.Supp.2d 318, 330 & n. 17 (W.D.Pa.2007) (explaining that preservation of the specific product that allegedly injured plaintiff usually is not required in design-defect cases because parties can test other products of the same design) (citing *Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79–80 (3d Cir.1994)); *Beers v. General Motors Corp.,* 1999 WL 325378, *6 n. 12 (N.D.N.Y. May 17, 1999) ("A defective design claim arguably does not require evidence of the product which

whether the duty to preserve evidence obligated Mimi So to preserve one exemplar of each of the allegedly infringing pieces, at least for a sufficient time to permit its inspection by plaintiff. We hold that, in the circumstances of this case, it does. *Accord Peyser*, 2000 WL 1071804, at *8.

2. *If Preservation of Exemplars Would Have Been Unduly Burdensome, Defendants Should Have Sought a Protective Order.*

Defendants also appear to suggest that the sale of the large-link exemplars should not be considered spoliation because the pieces are quite valuable.[75]

We do not doubt that the sale of each piece of jewelry constitutes a significant source of revenue for Mimi So; the record indicates that the price of a large-link necklace is between $6,000 and $11,500.[76] But this does not change our conclusion. It cannot be the case that a party may freely dispose of evidence otherwise subject to a duty of preservation simply because it is expensive. Such a rule would undoubtedly be unworkable and is, at any rate, not supported by any legal authority.

In reaching this conclusion, we note that the Federal Rules of Civil Procedure contemplate that the usual discovery obligations may prove particularly burdensome in some circumstances, and they provide an avenue for relief. They give the court broad authority to fashion protective orders to minimize the burden of discovery, but it is incumbent upon a party seeking relief from a discovery obligation to move for a protective order. *See* Fed.R.Civ.P. 26(b)(2)(C) (providing for limitations on otherwise permissible discovery if it is unduly burdensome); Fed.R.Civ.P. 26(c) (protective orders). If Mimi So was

concerned that preserving exemplars of the large-link pieces for inspection by plaintiff would unduly interfere with its business, it should have sought a protective order rather than resorting to self help. Upon an appropriate application, the court could have authorized Mimi So to sell the pieces on the condition that it assisted plaintiff in arranging for an inspection of the exemplars held by nonparty vendors or on the condition that Mimi So first provide notice to plaintiff and some reasonable window of opportunity in which plaintiff could have inspected the pieces.

3. *Date on Which Defendants' Duty to Preserve Large–Link Jewelry Exemplars Arose*

In many copyright cases, the duty to preserve evidence is triggered when the defendants receive a cease-and-desist letter from the plaintiff. *E.g.*, *Arista Records, LLC*, 633 F.Supp.2d at 139–40 (citing *Fox v. Riverdeep, Inc.*, 2008 WL 5244297, *7 (E.D.Mich. Dec.16, 2008)). In this case, plaintiff contends that defendants had actual notice that the large-link jewelry pieces were relevant evidence in forthcoming litigation as early as September 26, 2006, when Amedeo Scognamiglio contacted Edwin McQuigg and Christopher Colfer of Richemont to complain about the Gate B9 collection's alleged infringement on his own Stella line,[77] or at least as of October 3, 2006, when plaintiff's counsel wrote a cease-and-desist letter to McQuigg and Mimi So.[78]

Early on September 26, 2006, Mr. Scognamiglio called Mr. McQuigg to voice "his desire to have the Mimi So B–9 collection discontinued as he believed [it was] an infringement on existing Faraone Mennella designs." (Ex. 8 to Pl.'s Summ. J. Mot. Agst.

---

actually failed, since all of the same type of product are uniformly defective.'').

**75.** *See* Defs.' Jan. 14, 2010 Mem. at 3 (''Plaintiff cites no case holding that a defendant has an obligation to retain and not sell samples of a collection of jewelry that includes dozens of items worth in the aggregate hundreds of thousands of dollars.'').

**76.** *See, e.g.*, Ex. C to Pl.'s Dec. 15, 2009 Letter (Mimi So memo dated Dec. 13, 2007 showing a

large-link necklace billed to Neiman Marcus for $6,000); Linda Kalmbach Decl., Aug. 10, 2008, Ex. 39 to Pl.'s Summ. J. Mot., at ¶ 4 (stating that Mimi So large-link necklace was priced at $11,500 at Neiman Marcus).

**77.** *E.g.*, Pl.'s Jan. 11, 2010 Letter at 2; Pl.'s Mem. Law Supp. Summ. J. Mot. Agst. Mimi So, at 7.

**78.** *E.g.*, Steven M. Crosby, Esq. Letter to the Court, Dec. 5, 2007.

Mimi So (notes taken by Ed McQuigg)). Mr. McQuigg asked Mr. Scognamiglio to "forward an email showing the pieces from Mimi's collection that he felt infringed FM's collection-including photographs", and promised to forward the photos to Mimi So for her response. (*Id.*). Instead, Mr. Scognamiglio sent an email entitled "Mimi So copyright infringement", without photos or other attachments, to Mr. McQuigg and to Mr. Colfer, who at that time was in the London office of Richemont International.[79] In the email, Mr. Scognamiglio stated, in relevant part:

It is with great surprise and with profound disappointment that we just found out we have been totally copied by MIMISO [sic] with her new 'GATE B9' collection: Her gold link necklace, her gold hopp [sic] earrings, her bracelet are just a carbon copy [of] our Stella Collection [. . . .] We already informed our legal team of this unpleasant and damaging situation and will take all the necessary measures to prevent MIMI SO to continue copying our design and evaluate the current damage we are suffering.

(*Id.*). Mr. McQuigg forwarded the email to Mimi So. (Ex. 8 to Pl.'s Summ. J. Mot. Agst. Mimi So).

On October 3, 2006, counsel for RFMAS sent a cease-and-desist letter to Mr. McQuigg and Ms. So. (*See* Ex. 26 to Pl.'s Summ. J. Mot.). It purported to be a follow-up to the earlier email communications between Scognamiglio and McQuigg, and stated, in relevant part:

One of Faraone Mennella's most famous jewelry designs are [sic] necklaces, bracelets, and earrings with large twisted links among smaller links[.] You are selling necklaces and other jewelry that are substantially identical to our client's copyrighted jewelry designs (copies of your design, along with copies of our client's

copyrighted jewelry is [sic] enclosed). We demand that you cease and desist selling the jewelry. If we do not receive your satisfactory reply in no more than ten (10) days, to agree to stop selling the jewelry and to account to us for your sales, we will institute suit.

(*Id.*). Although the letter purports to enclose "copies" of Mimi So's design and plaintiff's jewelry, it is unclear what enclosures, if any, the letter actually contained. Plaintiff submitted the one-page letter in support of its summary-judgment motions, but without any exhibits or enclosures.

Neither the September 2006 email from Scognamiglio or the October 2006 cease-and-desist letter described the allegedly infringing pieces with enough specificity to put defendants on notice of the specific pieces that allegedly infringed plaintiff's intellectual property. Without the photographs attached to the cease-and-desist letter (if there were any), we are unable to say that defendants' duty to preserve exemplars of the large-link pieces was triggered by either plaintiff's September 26, 2006 email or its October 3, 2006 letter.

However, defendants were plainly on notice of the relevance of the large-link pieces once they were served with process in the instant suit, which plaintiff filed against the Mimi So and Richemont defendants on November 13, 2006, alleging that they had infringed on plaintiff's copyrighted jewelry design. (*See* Docket # 1; Compl. ¶ 9). In the complaint, plaintiff used photographs to identify the allegedly infringing Mimi So jewelry and the RFMAS pieces that were protected by the allegedly infringed copyright.[80] The two photographs of the allegedly infringing works depicted four pieces of jewelry from the Gate B9 collection (two necklaces, a bracelet, and a pair of earrings). (*See* Compl. ¶ 18; Ex. C to Compl.). Defendants were served with the complaint and its exhib-

79. Amedeo Scognamiglio Email to Ed McQuigg and Christopher Colfer, Sep. 26, 2006, available at Ex. A to Crosby Jan. 11, 2010 Decl./Ex. 18 to Edwin McQuigg Decl., July 29, 2008, Docket # 94/Ex. 8 to Christopher M. Colfer Decl., July 18, 2008, Docket # 95. Scognamiglio also copied his attorney, Stephen Feldman, Esq. of the Feldman Law Group, on this email. (*See id.*).

80. *See* Ex. B to Compl. (photographs of plaintiff's "subject works"); Ex. C to Compl. (photographs of defendants' allegedly infringing products); Ex. C to Am. Compl. (photographs of defendants' allegedly infringing products).

its on November 21, 2006. (*See* Docket # 3–5). Thus, as of November 21, 2006, defendants were obligated to preserve exemplars of the allegedly infringing pieces.

### 4. *Litigation–Hold Policy Requirements*

Once defendants received notice that the large-link pieces were relevant to this action, their duty to preserve relevant evidence required them to determine whether they had any exemplars of the four allegedly infringing pieces within their custody or control, and if so, to set aside one exemplar of each piece to ensure that the exemplar was not disposed of before Mimi So either made it available to plaintiff pursuant to a request for inspection or obtained a protective order authorizing the sale of the evidence. *See Zubulake IV,* 220 F.R.D. at 218; *Zubulake V,* 229 F.R.D. at 432. If the inspection at the outset of the litigation had revealed that Mimi So was missing exemplars of one or more of the allegedly infringing pieces, it would have been incumbent upon Mimi So to put in place a system for monitoring its receipts and outputs to avoid negligently spoliating newly acquired evidence. *See Zubulake V,* 229 F.R.D. at 432–33.

 The Mimi So defendants have not proffered any evidence that they took any steps to prevent the spoliation of the exemplars of the large-link pieces, such as implementing a litigation-hold policy at the outset of the litigation or monitoring their receipts and shipments of product for relevant evidence during the litigation. Plaintiff points out that Mr. Richardson's testimony suggests that Mimi So "did not even begin to gather the infringing products until they were preparing for a Court-ordered comparison photograph shoot." (Pl.'s Jan. 11, 2010 Letter at 6).[81]

Spoliation by a party that has failed to implement a litigation-hold policy, even if unintentional, is not merely negligent, but grossly negligent or reckless. *Zubulake IV,* 220 F.R.D. at 221 (internal citations omitted).

The Mimi So defendants have had ample opportunity to present evidence in opposition to this motion for sanctions for spoliation. We infer from their failure to submit an applicable litigation-hold policy that they had none. Their failure to implement a litigation-hold policy to ensure that key evidence was not disposed of renders their spoliation particularly culpable.

We likewise infer that the Mimi So defendants took no affirmative steps to monitor Mimi So's inventory periodically to ensure the preservation of evidence. Mimi So manufactured pieces on a regular basis in response to new orders, and vendors occasionally returned pieces to Mimi So, which Mimi So then attempted to re-ship as quickly as possible. As a business with a high turnover of product, Mimi So had multiple opportunities to mitigate the damage done by its initial spoliation—all of which it missed by this failure.

### 5. *The Mimi So Defendants' Control Over Pieces Held By Neiman Marcus*

The Mimi So defendants suggested in their opposition to plaintiff's summary-judgment motion that plaintiff could have inspected the large-link pieces at Neiman Marcus. (Mimi So Defs.' Mem. Law Opp., Sep. 19, 2008 (under seal at 114), at 10). Plaintiff countered on reply that the large-link pieces held by Neiman Marcus for sale on consignment were within defendants' "control" and that it was incumbent upon defendants to arrange for an inspection of the pieces at Neiman Marcus. (Pl.'s Reply Mem. Supp. Summ. J. Mot. Agst. Mimi So Defs., Oct. 10, 2008 (filed under seal at Docket # 134), at 4–5).

However, the record is relatively bare of information about the structure of the relationship between Mimi So and Neiman Marcus as regards Gate B9 pieces sold by Neiman Marcus on consignment. We do not know what rights, if any, Mimi So retained over pieces sold on consignment.

---

81. Although plaintiff does not cite anything for this proposition, we infer that plaintiff is referring to Mr. Richardson's December 14, 2007 declaration, in which he states, "In my capacity [as] Chief Financial Officer, I searched the premises of International, in accordance with the or-

der of this court to produce representative samples, of all the then currently available inventory items from the Gate B–9 Collection [ . . . ] the afternoon of December 4, 2007." (Richardson Dec. 14, 2007 Decl. ¶ 3).

While plaintiff implies that Neiman Marcus was merely an agent for Mimi So and that Mimi So retained ownership of the pieces and the ability to reclaim them at any time, Mr. Richardson's testimony suggests that this was not the case. He testified at his deposition that Mimi So would have "a lot of difficulty" in retrieving pieces that it had delivered to Neiman Marcus. (William Richardson Dep., Jan. 8, 2008, at 11). He explained:

> When we move them around, we give them to Neiman Marcus on the general conditions that they—they have them for six months to one year. We do not ask for them back. We do not have a habit. Neiman Marcus, every six months, rotates the stock, that's when we get an opportunity to get them back. In the meantime, they go from store to store.

(*Id.*). He added that customers would be upset if Mimi So were to ask to borrow back the pieces. (*Id.* at 14).

Ordinarily it is incumbent upon the party seeking relief to demonstrate the facts upon which the relief depends. Plaintiff, despite having extensive opportunities to refine its arguments and evidentiary proffer on this issue, has not proved that pieces that were not in the Mimi So defendants' possession were nonetheless within their "control". We therefore decline to impose sanctions on this basis. *See Golden Trade, S.r.L.,* 143 F.R.D. at 525 (party seeking to compel production of documents must establish factual basis supporting its assertion that requested documents were within other party's "control").

This is particularly appropriate since we advised plaintiff at a conference on January 4, 2008 to pursue from Neiman Marcus discovery that it was unable to obtain from the Mimi So defendants. (*See* Tr., Jan. 4, 2008 Conf., at 31–32; Mimi So Defs.' Mem. Law Opp. Pl.'s Summ. J. Mot. at 10 (citing *id.*)). Despite obtaining what, in effect, was the court's authorization either to serve a subpoena directing Neiman Marcus to produce the pieces for inspection or to file a motion to compel defendants to arrange for an inspection of the pieces at Neiman Marcus (*see*

Conf. Tr., Jan. 4, 2008, at 31–32), plaintiff pursued neither course. Thus, its current assertion of prejudice for the alleged failing on defendants' part is unavailing.

### C. *Richemont Defendants*

There is no evidence that any of the Richemont entities that are defendants in this case possessed any pieces of Gate B9 jewelry at any point. Plaintiff argues that pieces of jewelry held by Richemont Japan were within the "control" of the Richemont defendants. (Pl.'s Mem. Law Supp. Summ. J. Mot. Agst. Richemont Defs. at 17). Apart from this conclusory assertion, plaintiff has made no effort to establish the basis for this control argument. Moreover, even assuming that plaintiff is correct on the "control" issue, the only evidence in the record that Richemont Japan possessed any Gate B9 jewelry after the initiation of this lawsuit is the testimony of Daniel Mawicke on December 13, 2007 that Richemont Japan possessed a Mimi So ring, which is not one of the allegedly infringing Gate B9 pieces that plaintiff was unable to examine.

We infer that plaintiff also seeks to hold the Richemont defendants responsible for spoliation by the Mimi So defendants. (Pl.'s Mem. Law Supp. Summ. J. Mot. Ag'st Richemont Defs. at 13 (moving to sanction Richemont defendants "for its [sic] collaboration in Defendants' spoliation of essential evidence.")). However, plaintiff has again failed to identify either a factual or a legal basis for this theory, making only a handful of conclusory and generic assertions to the effect that Mimi So is under Richemont's "control". Plaintiff submitted as evidence an excerpt of Mr. Mawicke's deposition, at which plaintiff asked about the operational relationship between Mimi So and Richemont Holdings I. (Mawicke Dep. at 171). Mawicke responded that any operational relationship with Mimi So would have been with Richemont North America, not Richemont Holdings, but plaintiff asked no follow-up questions. (*Id.* at 171–72). Moreover, defendants proffered affirmative evidence that Mimi So was in fact not under the control of any of the Richemont defendants.[82]

---

[82]. *See* Mawicke Dep. at 171–72; Margiotta Aug. 11, 2008 Decl. at ¶¶ 10, 14; Kinney Dep. at 96– 98; So Dep. at 232.

In short, plaintiff has failed to demonstrate that the Richemont defendants had any exemplars of the key Gate B9 pieces in their possession, custody, or control when this litigation commenced or at any time thereafter.

### D. Alleged Misrepresentations Regarding Jewelry Exemplars

Plaintiff alleges that, in addition to spoliating relevant evidence, defendants misrepresented the facts concerning their possession of the key jewelry pieces and their ability to correlate photographs of Gate B9 pieces with documentation of the sales of those pieces, both to plaintiff and to the court.

On December 7, 2007 and December 14, 2007, counsel for the Mimi So defendants represented that they had no exemplars of the large-link jewelry pieces in their custody or control. (Barry G. Magidoff, Esq. Letter to the Court, Dec. 7, 2007; Richardson Dec. 14, 2007 Decl. ¶¶ 3, 8, 11). However, Mimi So's billing memos demonstrate that it shipped these pieces on December 12, December 13, and December 17, 2007.

The Mimi So defendants have declined to offer any evidence as to when they created or otherwise obtained the pieces that they shipped on those dates other than general testimony as to Mimi So's practices that suggests that the company does not keep pieces of jewelry around its offices for very long.

It is possible that Mimi So received these pieces unexpectedly in the days between December 7, 2007—when counsel for Mimi So represented that it had no such pieces available—and December 12, 2007, when Mimi So shipped one large-link piece from its offices. Thus, it is possible that counsel for Mimi So fully investigated the existence of any large-link pieces and that his December 7 representation that those pieces "are not presently available (and were not available on Tuesday) to defendants" was an accurate statement. (Barry G. Magidoff, Esq. Letter to the Court, Dec. 7, 2007). However, Mr. Richardson's December 14, 2007 testimony offers even greater cause for concern, as it made no

mention of the December shipments. (See supra, at 27). Defendants' only response to this "alleged discrepancy" between Richardson's testimony and Mimi So's records is that plaintiff's complaint is untimely. (Defs.' Jan. 14, 2010 Mem. at 4).

At the deposition of Mr. Richardson on January 8, 2008, defendants' attorney again represented that they had no large-link necklaces or bracelets, that Mimi So was not presently fulfilling orders for large-link bracelets, and that they had been unable to bring these pieces to the deposition.[83] In light of the series of shipments in December 2007, these statements were either false or misleadingly incomplete.

Despite the impressive heft of the court file before us, defendants have left conspicuous gaps in the factual record concerning when Mimi So obtained the large-link pieces shipped in December, who at Mimi So and the offices of their counsel knew about the December shipments, and what steps they took to comply with my December 10 order to proffer a sworn affidavit by a person with knowledge attesting under oath that they did not "presently" have any exemplars, as they had represented in their December 7 letter. (Endorsed Order, Dec. 10, 2007). In the absence of any explanation by Mimi So, we are left to conclude that, at a minimum, the Mimi So defendants were grossly negligent not only in controlling evidence that they knew to be relevant, but in representing the true facts in complete and candid terms to plaintiff and to the court.

### E. Summary

In sum, based on the record before us, we find that the Mimi So defendants shipped exemplars of these pieces from their office at least sixteen times between November 21, 2006, when defendants were served with the complaint in this action, and February 18, 2008, but had no exemplars of these pieces to produce for inspection by plaintiff or plaintiff's experts on December 4, 2007 or August 31, 2009. Instead of seeking the court's pro-

---

83. Richardson Dep., Jan. 8, 2008, at 7 (Magidoff: "As we explained previously, we do not have any copies of those in our custody, control, or posses- sion."); id. at 41 (Q: "Is Mimi So presently sending large-link bracelets to customers?" A: "No.").

tection from its discovery obligations, Mimi So simply sold the key evidence in this case, without so much as a word of notice to plaintiff. We reject defendants' position that the well-established obligation to preserve evidence did not require them to refrain from selling Mimi So's custom-made jewelry or notify plaintiff when exemplars of previously-unavailable pieces became available for inspection. The Mimi So defendants are guilty of spoliation. There is no evidence, however, to support the charge of spoliation against the Richemont defendants. We also find that the available evidence suggests that the Mimi So defendants misrepresented to the court and to plaintiff the facts concerning their possession of large-link pieces.

Before we turn to the question of what sanctions are appropriate, we will determine whether defendants are also guilty of violating discovery obligations with respect to the so-called "visual evidence correlating [Mimi So's] jewelry designs to sales numbers". (Pl.'s Dec. 15, 2009 Letter at 1).

## IV. DEFENDANTS' ALLEGED FAILURE TO PRODUCE A KEY CODE TO GATE B9 ITEM NUMBERS

■ Although plaintiff refers to its motion as one "for spoliation" (e.g., Crosby Jan. 15, 2010 Decl. ¶ 1), plaintiff's second grievance, regarding the so-called "visual correlation", appears to be primarily a complaint that defendants failed to produce certain evidence in a timely manner.[84] This complaint seems to stem from plaintiff's quest to find sales data for each individual piece of jewelry in the Gate B9 Collection presented with an accompanying picture of that piece of jewelry.[85] There is no evidence that defendants actually had sales data in such a format.[86] Rather, plaintiff's complaint seems to be based on defendants' failure to produce in a timely fashion a complete set of photos of Gate B9 pieces labeled with the corresponding item numbers—a missing link or "key code"[87] that would have allowed plaintiff to understand how the item numbers that appear in sales records produced by defendants match up to the pieces of jewelry pictured in photographs of the Gate B9 collection.

### A. The Allegedly Withheld Evidence

Although plaintiff is generally vague about what, specifically, defendants withheld, plaintiff's papers mention three specific pieces of evidence that we infer would have helped plaintiff to fully decode Mimi So's item numbers and thus to understand how the sales data related to the images of Gate B9 jewelry: 1) a document dated January 5, 2009 containing small images of all pieces of Gate B9 jewelry for which defendants have a photo and the corresponding item number and shorthand item description for each piece; 2) JPEG files containing digital photographs of individual pieces of jewelry in the Gate B9 collection, which specify the corresponding item number in the file name; and 3) Mimi So marketing materials known as "line sheets", which contain images of many pieces of Gate B9 jewelry for which defendants have a photo (but not all of them). Plaintiff re-

---

84. Although the failure to either produce evidence in response to an appropriate discovery request or assert a basis for objecting to the request is a violation of discovery obligations, see Fed.R.Civ.P. 34(b)(2)(A),(B), this does not technically constitute spoliation. See, e.g., Residential Funding Corp., 306 F.3d at 106 (distinguishing between "a typical spoliation case" involving destruction of evidence and breach of a discovery obligation, such as failure to timely produce evidence).

85. In its summary-judgment motion papers, plaintiff refers to its efforts to obtain the information at issue in this motion for sanctions as a "quest for what MSI sold." (Steven M. Crosby, Esq. Suppl. Decl., Oct. 10, 2008, filed under seal at Docket # 134 and available at Ex. A to Margiotta Jan. 14, 2010 Decl. ["Crosby Oct. 10,

2008 Decl."], ¶ 31; see also infra, at 42 & nn. 97–99).

86. In fact, the record demonstrates that defendants did not even have a photograph of every piece of jewelry in the Gate B9 collection to which it assigned an item number. (Richardson Sep. 19, 2008 Decl. ¶ 4; Ex. 6 to id.).

87. Plaintiff sometimes refers to the information sought in terms along these lines: "a 'key code' to [ . . . ] sales" (Pl.'s Mem. Law Supp. Mot. Agst. Mimi So, at 11), a "key code" (Theodore Anderson, Esq. et al. Letter to the Court, Dec. 15, 2009, at 3), and "the decoding paper that lined up the pieces with the code" (Conf. Tr., Mar. 20, 2008 2:24–25); "the Code Key" (Pl.'s R. 56.1 Statement ¶ 38).

ceived all of these documents after the close of fact discovery on April 4, 2008.[88]

### 1. *January 5, 2009 Document with Jewelry Photos and Item Numbers*

The document dated January 5, 2009 at issue on this motion contains small images (approximately two inches by three inches) of Mimi So jewelry, each of which is accompanied by an item number and a shorthand textual description. (*See* Ex. C to Margiotta Jan. 14, 2010 Decl.). Defendants report that they provided this document to plaintiff on January 6, 2009. (Defs.' Jan. 14, 2010 Mem. at 2). The document does not appear to contain an image corresponding to item number B9NGYG0000627, which plaintiff identified as the key large-link necklace in this case. (*See* Ex. C to Margiotta Jan. 14, 2010 Decl.). However, on January 8, 2009, Mimi So produced a replacement sheet for page 21 of the January 5 document. (Crosby Jan. 15, 2010 Decl. ¶ 5). The replacement sheet, labeled "CORRECTED" and dated January 8, 2009, contains an image of item number B9NGYG0000627, labeled as such. (*See* Ex. B to Crosby Jan. 15, 2010 Decl.) [89]

It appears that defendants or their counsel created the January 5, 2009 document solely for the purpose of helping plaintiff understand evidence that defendants had already produced to satisfy a directive that I issued at a December 19, 2008 conference. (*See infra*, at 96 (citing Conf. Tr., Dec. 19, 2008, at 14–15); Crosby Jan. 15, 2010 Decl. ¶ 3). Defendants provided this document to plaintiff the day after they created it. We infer that

plaintiff's complaint that defendants should have produced this document earlier is really a complaint that defendants should have created an explanatory document of this nature sooner.

### 2. *Digital Photo JPEG Files*

Defendants produced printouts of all existing digital photographs of Gate B9 jewelry as early as December 3, 2007.[90] Plaintiff's complaint is not with defendants' production of the images themselves, but rather, that defendants did not produce the computer files storing these images in a timely enough manner. It appears that the digital images were stored on defendants' computer as JPEG files, and that each JPEG file was labeled with the item number of the piece of jewelry featured in the photograph. (*See* Pl.'s Dec. 15 Letter at 4; Pl.'s Jan. 11 Letter at 4). Thus, the computer file itself (specifically, the name assigned to the file) contained relevant information that plaintiff did not receive when defendants originally produced the photographs in hard copy.[91] Defendants provided plaintiff with compact discs containing the actual JPEG files in two batches, delivered on August 4, 2009 and September 2, 2009. (Pl.'s Dec. 15, 2009 Letter at 4).

### 3. *"Line Sheets"*

According to plaintiff, following its deposition on June 23, 2008 of Lisa Kazor, a representative from Neiman Marcus, Neiman Marcus produced to plaintiff marketing materials that Mimi So had created and issued to Neiman Marcus. (*See* Crosby Oct. 10, 2008 Decl. ¶ 6; Pl.'s Dec. 15 Letter at 3).[92]

---

88. *See* Conf. Tr., Mar. 20, 2008, at 35 (noting that fact discovery on remaining open issues would close April 4).

89. A side-by-side comparison of the January 5 and January 8 documents suggests that whoever created the January 5 document mis-aligned the images and item numbers in the middle of page 21, mislabeling the key large-link necklace with the item number that corresponds to the next image on that page.

90. Defs.' Jan. 14, 2010 Mem. at 3 (citing Ex. D to John Margiotta, Esq. Decl., Jan. 14, 2010 (photograph of large-link necklace Bates stamped RMT 000442); Ex. E to John Margiotta, Esq. Decl., Jan. 14, 2010 (cover letter dated Dec. 3, 2007 reflecting production of documents for several

Bates ranges encompassing document number RMT 000442)).

91. *Compare* Ex. D to Margiotta Jan. 14, 2010 Decl. (photograph of large-link necklace as photo was originally produced to plaintiff on Dec. 3, 2007) *with* Ex. C to Pl.'s Dec. 15, 2009 Letter at last page (screenshot showing both the content of the JPEG file—that is, the photograph of a large-link necklace—and the file name, "B9NGYG0000627").

92. The Richemont defendants argued on summary judgment that plaintiff had not sufficiently authenticated the line sheets allegedly produced by Neiman Marcus. (*See* Richemont Defs.' R. 56.1 Counter–Statement ¶ 49 ("Plaintiff Statement: Neiman Marcus has produced Gate B9

These so-called "line sheets" consist of several pages of small photos of individuals piece of Gate B9 jewelry, next to which are listed one or more item numbers and accompanying shorthand textual descriptions and a suggested retail price.[93] In the August 3, 2007 and May 19, 2008 line sheets, each jewelry image is approximately two inches square; in the February 20, 2007 line sheet, each image appears to be less than one square inch. (*See* Ex. 20 to Pl.'s Summ. J. Mot.). All the images appear rather grainy; Mimi So testified that the photos used in line sheets are "almost always of very low resolution". (Mimi So Decl., Dec. 17, 2008, ¶ 4). Each line sheet document bears a date in the footer. (*See id.*). The three sets of line sheets that Mimi So reportedly provided to Neiman Marcus are dated February 20, 2007; August 3, 2007; and May 19, 2008. (*See id.*).

Defendants do not deny that they did not produce these line sheets to plaintiff during discovery.[94] They explained that Mimi So does not keep a copy of the line sheets given to any particular customer. (Richardson Sep. 19, 2008 Decl. ¶ 12). Mimi So testified that a line sheet is a "list of specific items being offered to a particular buyer at a particular time", rather than a comprehensive list of every piece of jewelry available from Mimi So. (Mimi So Decl., Dec. 17, 2008, ¶ 4). Richardson explained that Mimi So updates the electronic document from which the line sheets given to Neiman Marcus (and all other wholesale customers) were generated on a regular basis, adding new items and deleting

items that it had decided not to emphasize. (Richardson Sep. 19, 2008 Decl. ¶ 12).

### B. *Defendants' Failure to Keep Copies of Line Sheets Is Not Spoliation.*

▮ Plaintiff does not challenge defendants' representation that they did not keep copies of the line sheets that they distributed to Neiman Marcus. Plainly, defendants cannot be faulted for failing to produce records they do not have, unless they were obligated to retain those records. Although a party's failure to keep records may sometimes warrant drawing negative inferences against that party about what the records would have reflected,[95] a failure to create records—as opposed to the destruction of records that were kept—is not spoliation. Thus, there is no basis for plaintiff's complaint about the line sheets.

At any rate, the Mimi So defendants' failure to keep copies of the line sheets that it distributed has not gone unaddressed. Because of this gap in the Mimi So defendants' records, we authorized plaintiff to take third-party discovery from Neiman Marcus (Conf. Tr., June 9, 2008, at 21), and of course plaintiff ultimately obtained the line sheets from Neiman Marcus. If plaintiff had wished to pursue any additional remedies for this alleged failure of record-keeping by the Mimi So defendants, plaintiff should have sought whatever relief it deemed appropriate at the conference at which that issue was discussed.[96]

Below, we briefly review the requirements for requesting evidence in discovery and re-

---

line sheets correlating Gate B0 pictures to actual sales. Response: Disputed. Plaintiff has offered no evidence that the exhibit to which it cites was produced by Neiman Marcus. (*See* Pl.'s Ex. 20.)'')).

**93.** One of the line sheets also contain a two-page summary of the features of the Gate B9 Collection.

**94.** Mimi So Defs.' R. 56.1 Counter–Statement ¶ 48; *see also* Pl.'s Mem. Law Supp. Summ. J. Mot. Agst. Mimi So Defs. at 13 ("Though plaintiff asked for anything connecting pictures to sales numbers repeatedly, Defendants had never identified [or] produced any 'look books' or 'line sheets'.'').

**95.** *See* Conf. Tr., June 9, 2008, at 4 (noting, in response to plaintiff's complaints about defen-

dants' lack of records, that plaintiff is free to argue that defendants "are tantamount to infringers who have kept no records of their sales" against whom negative inferences should be drawn).

**96.** As I observed at the conclusion of that conference, "Insofar as there are other requests contained in the plaintiff's correspondence, I believe they have, as I look through my notes, not been reiterated here. And just to make it clear, they are denied." (*Id.* at 22). *See* Mimi So Defs.' R. 56.1 Counter–Statement ¶ 48 (arguing that "the lack of any such production [of line sheets] can not be considered spoliation, especially in view of the denial by Magistrate Judge Dolinger of plaintiff's earlier requests").

sponding to discovery requests, and then analyze the record concerning the discovery orders, requests, and responses in this case relevant to the other two pieces of key code evidence. We conclude that plaintiff has failed to demonstrate that defendants shirked any duty, and that, at any rate, plaintiff's application regarding these pieces of evidence is untimely.

### C. *Scope of Obligation to Provide Discovery Under the Federal Rules*

Federal Rules of Civil Procedure 26 through 37 lay out a framework for conducting discovery in most civil cases. They provide parties with a wide range of tools for discovering "any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter". Fed.R.Civ.P. 26(b)(1). Although Rule 26 requires parties to automatically disclose certain pieces of information at the outset of many civil cases, *see* Fed.R.Civ.P. 26(a)(1), for the most part the discovery system is predicated on the exchange of requests for information. The Federal Rules require that requests for discovery be made formally, and that requests be focused and specific. Every discovery request must be made in a writing signed by an attorney of record to certify that the request is consistent with the Federal Rules of Civil Procedure, warranted by law, not for an improper purpose, and "neither unreasonable nor unduly burdensome or expensive". Fed.R.Civ.P. 26(g)(1)(B). Parties have no duty to act on an unsigned request, and a court may impose sanctions for a requesting party's failure to properly certify a discovery request. Fed.R.Civ.P. 26(g)(2), (3).

To obtain access to physical evidence (other than documents) in the possession of another party, a litigant must serve a request to inspect the evidence. The request "must specify a reasonable time, place, and manner for the inspection". Fed.R.Civ.P. 34(b)(1)(B). Like requests for production of documents, requests for an inspection of physical evidence must "describe with reasonable particularity each item or category of items" sought. Fed.R.Civ.P. 34(b)(1)(A).

A party upon whom a formal discovery request has been served then has 30 days in which to respond or object to the request. Fed.R.Civ.P. 34(b)(2)(A), (B). Discovery responses must be signed and certified in the same manner as discovery requests, and the responding party is obligated to supplement its responses in a timely manner if it learns that a response is materially incorrect or incomplete. Fed.R.Civ.P. 26(e)(1)(A), (g)(1); *see also Zubulake V*, 229 F.R.D. at 433 (stating that counsel has a continuing burden to "periodically recheck all interrogatories and canvass all new information." (citing 1966 Advisory Comm. Note to Fed.R.Civ.P. 26(e))).

If the responding party fails to timely and fully respond to a formal discovery request, the requesting party must confer with the responding party to attempt to obtain the discovery. Fed.R.Civ.P. 37(a)(1), (4). If this good-faith effort to resolve the problem without court intervention fails, the requesting party may then move to compel the discovery, *see* Fed.R.Civ.P. 37(a)(1), and if the discovery deficiency concerned an interrogatory or request to inspect, the requesting party may move for sanctions. *See* Fed.R.Civ.P. 37(d)(1)(A). Motions to compel and motions for sanctions under Rule 37 must be accompanied by a certification that the movant "has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action". Fed.R.Civ.P. 37(a)(1); Fed.R.Civ.P. 37(d)(1)(B).

### D. *Plaintiff Fails to Proffer Applicable Discovery Requests*

Plaintiff suggests that defendants were obligated to produce these various pieces of "key code" evidence in response to plaintiff's formal and informal requests for production of documents and questioning of defendants' agents. Plaintiff describes the evidence that it purportedly requested during discovery in a variety of confusing ways, such as "visual

evidence" connecting the jewelry to sales data[97] or, more broadly, as simply "evidence" providing a link between defendants' sales and the Gate B9 pieces[98] or a "tie" between the depictions of the Gate B9 pieces and sales data.[99] Since plaintiff's complaint is primarily that defendants were not sufficiently prompt and forthcoming with this evidence, it is particularly puzzling that plaintiff has made only scant efforts to identify any particular discovery request or court order in response to which defendants should have produced this evidence in the first instance. Plaintiff complains generally of defendants' sluggishness, but plaintiff's many submissions gloss over the details of when and how it may have requested this evidence[100] and when and how, precisely, defendants responded.[101]

The 177 exhibits that plaintiff submitted in connection with its motions to sanction defendants for "spoliation" contain only one formal discovery request. That request, titled "Plaintiff's First Requests for Documents and Things" is dated "March, 2007" and signed by Kenneth S. Feldman, Esq., attorney for plaintiff, who did not fill in the blank left in the date field. (*See* Ex. 13 to Pl.'s Summ. J. Mot.). Among other things, this document requests, "[a]ll documents regarding Defendant's Works" (*id.* at p. 5 ¶ 6); "[r]epresentative samples of each of Defendant's Works" (*id.* at p. 6 ¶ 20); "[a]ll documents that relate to each Defendant's sales of the Works" (*id.* at p. 7 ¶ 25); "[a]ll documents that relate to each Defendant's advertising and/or promotion of the Works" (*id.* at p. 7 ¶ 28); "[a]ll documents referencing third party's sales of the Works, including any and all Customers." (*id.* at p. 8 ¶ 45); "[a]ll documents which show all sales of jewelry of the Works by each Defendant" (*id.* at p. 9 ¶ 49); and "[a]ll documents identified in the answer to Defendant's Interrogatories to Plaintiff"

97. Along this line, plaintiff referred to the information sought as "the pictures of what Defendants sold tied to sales numbers ('line sheet' evidence)" (Pl.'s Mem. Law Supp. Mot. Agst. Mimi So, at 7); "visual evidence of the sales numbers showing what they sold" (*id.* at 11); a "visual record of sales" (*id.* at 20); "the 'line-sheet' evidence, the visual evidence of what designs the sales numbers represent" (Pl.'s Mem. Law Supp. Mot. Agst. Richemont, at 13–14); "the visual evidence of what designs the sales numbers represent (the line sheet evidence)" (*id.* at 14); a "visual representation tied to the sales numbers" (Conf. Tr., June 9, 2008, at 3:24); "[t]he pictures with the item numbers" (Conf.Tr., Dec. 19, 2008, 13:15); a "visual correlation" (Pl.'s Dec. 15, 2009, at 3); "visual record of what MSI sold" (*id.*); "the visual connection Plaintiff sought for key large link Gate B9 pieces" (Crosby Oct. 10, 2008 Decl. at ¶ 31).

98. For example, plaintiff has characterized its request as one for "evidence tying the jewelry pictured in their catalog to the sales numbers" (Pl.'s Mem. Law Supp. Summ. J. Mot. Agst. Mimi So, at 6), "sales evidence" (*id.* at 7), "evidence tying pictures to sales numbers" (*id.* at 13), "Defendants' evidence tying such pictures to sales" (*id.* at 18), and "anything connecting pictures to sales numbers" (*id.* at 13).

99. Plaintiff sometimes described the information it sought in terms such as "the sales tie to visual evidence of what they sold" (Pl.'s Mem. Law Supp. Mot. Agst. Mimi So, at 12), "the best tie from sales to pictures" (*id.*), "the definitive tie

from pictures to sales numbers" (*id.*), "this tie from the pictures in the catalog to the sales Defendants made" (*id.*), and "the spoliated pieces and pictures tied to sales" (*id.* at 15).

100. *E.g.*, Pl.'s Mem. Law Supp. Summ. J. Mot. Agst. Mimi So, at 11 (stating that "in responses to requests for documents, in deposition, in discovery conferences, and in letters to the Magistrate" for the last six months, "Defendants claim[ed] to have no pieces or other visual evidence of the sales numbers showing what they sold" but citing nothing); *id.* (claiming without elaboration that "Despite applicable document requests, Plaintiff had to press Defendants over and over, obtain orders from the Magistrate for production of full sales documents, a 'key code' to such sales which was never fully produced, depositions, and finally for a declaration connecting the catalog pictures to the sales numbers").

101. *E.g.*, Pl.'s Mem. Law Supp. Summ. J. Mot. Agst. Mimi So, at 11 (stating that "witnesses said other Mimi So employees would know the information, the computer was needed, or the right questions needed to be asked, before the evidence would be revealed" but not citing anything or identifying any particular witness); *id.* ("Defendants' representations were often conflicting"); *id.* at 12 ("Defendants essentially said 'we were wrong we can't do it' "); Pl.'s Mem. Law Supp. Summ. J. Mot. Agst. Richemont, at 18–19 ("MSI's witnesses each stated the item numbers on the invoices did not definitively correlate to one pictured item. Each gave unclear testimony

(*id.* at p. 9 ¶ 51).[102]

Plaintiff has not bothered to identify which of its generally worded requests allegedly required defendants to produce each piece of key code evidence that plaintiff claims that defendants unduly withheld. Plaintiff also failed to proffer defendants' responses, so we have no way of knowing whether defendants objected to any of these requests.

Although discovery tools can be powerful, they do nothing for the litigant who chooses not to use them. Having failed to point to an applicable discovery request, plaintiff has little basis for complaining about the timing and content of defendants' production of documents, or complaining that defendants resisted plaintiff's efforts to elicit the key code information through the testimony of knowledgeable witnesses [103] and used careful wording to avoid committing to a position.[104] I previously advised plaintiff that it was free to serve defendants with interrogatories,[105] but if plaintiff elected to employ this tool, it is not evident from the record. Plaintiff also failed to point to any particular deposition testimony in which witnesses answered plaintiff's questions in a manner that plaintiff deemed unsatisfactory.

Although we do not doubt that plaintiff may have informally requested defendants' assistance in understanding the Mimi So item number system, this does not help plaintiff here. Much discovery can and should be accomplished informally. The Federal Rules encourage cooperation, requiring parties to work with opposing counsel to clarify discovery requests and resolve apparent deficiencies in discovery responses rather than resorting to formal motion practice in the first instance.[106] Moreover, a prolonged course of intentionally uncooperative or obstructive behavior can be the basis for sanctions.[107] However, plaintiff's quest for a key code highlights some of the policy reasons for requiring discovery requests to be made formally.

First, the requirement that discovery requests be specific generally serves the purpose of clarity. Given the confusing and varied ways that plaintiff described the evidence that it sought at conferences and in these motion papers, we question whether plaintiff's informal requests for this evidence sufficiently communicated to defendants what it was that plaintiff was seeking. Had plaintiff invested the time and thought in generating a single, precise description of the desired evidence, the coherence of the request might have been much improved. Indeed, at a January 2008 conference, plaintiff raised a number of perceived deficiencies in

---

on the correlation, and said other witnesses might know better.").

**102.** The document states that it is governed by the "Uniform Definitions set forth in Rule 26.3 of the Local Rules" in addition to specific definitions set forth in the request, such as a definition of the term "document" as being "synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a)". (*Id.* at p. 1). It defines "Defendants' Works" to mean "those Works referenced in the Complaint made by Defendant, including any jewelry in Defendant Mimi So International, Inc.'s Gate B–9 Collection". (*Id.* at p. 4).

**103.** *See* Pl.'s Mem. Law Supp. Summ. J. Mot. Agst. Mimi So, at 11 (stating generally that "witnesses said other Mimi So employees would know the information, the computer was needed, or the right questions needed to be asked, before the evidence would be revealed"); Pl.'s Mem. Law Supp. Summ. J. Mot. Agst. Richemont, at 18–19 ("MSI's witnesses each stated the item numbers on the invoices did not definitively correlate to one pictured item. Each gave unclear

testimony on the correlation, and said other witnesses might know better.").

**104.** Pl.'s Mem. Law Supp. Summ. J. Mot. Agst. Mimi So Defs. at 12 (referring to defendants' use of "carefully worded declarations" to "hid[e the fact] that the catalog pictures represent the same pieces the sales numbers do.").

**105.** Conf. Tr., Mar. 20, 2008, at 12 ("The parties are, as you well know, free, if they wish, to sculpt contention interrogatories.").

**106.** Fed.R.Civ.P. 37(a)(1) (motion to compel must include certification that movant "has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action"); *see also* Fed.R.Civ.P. 37(d)(1)(B) (same certification required for motion for sanctions for failure to respond to discovery request).

**107.** *See Zubulake V*, 229 F.R.D. at 436 ("[A]s a discovery deadline [ ... ] draws near, discovery conduct that might have been considered 'merely' discourteous at an earlier point in the litigation may well breach a party's duties to its oppo-

defendants' document production, and defendants noted that they had difficulty understanding the request even after discussing it with opposing counsel for hours, and observed that their ability to respond would be improved if plaintiff would reduce the request to writing.[108]

Second, some of these requests could potentially have been quite burdensome. The discovery tools discussed in the previous section (*supra*, at 41), do not provide any obvious basis for plaintiff to serve defendants with a request to create new documents to help plaintiff understand the existing evidence. To the extent that plaintiff lacked the information necessary to understand evidence that defendants produced, plaintiff was of course entitled to seek the missing information through depositions of defendants' agents, interrogatories, and requests for production of existing documents or computer files containing the missing information. However, the Federal Rules do not vest in plaintiff a right to demand that defendants' counsel take on the tedious work of going through the item numbers and accompanying shorthand descriptions on Mimi So sales documents and matching the documents up to the photo fitting that description. In fact, attorneys may create new documents analyzing the evidence in the case for their own use

during the litigation, and the Federal Rules explicitly state that such documents are ordinarily not discoverable by the other party. *See* Fed.R.Civ.P. 26(b)(3)(A). A responding party has only a limited obligation to organize requested documents in the manner preferred by the requesting party,[109] and the Federal Rules evince a concern that discovery tools not be used to unduly shift the burden of analyzing evidence from the requesting party to the responding party.[110] Thus, to the extent that plaintiff sought to have defendants re-sort evidence that they had already produced in order to present a photo of each piece of jewelry with the corresponding sales data, such a request would be counter to the spirit of the discovery system created by the Federal Rules. If plaintiff was not willing to sign a formal request for this information, certifying that the request was consistent with the Federal Rules and "neither unreasonable nor unduly burdensome", Fed.R.Civ.P. 26(g)(1)(B), then defendants had no duty to oblige. *See* Fed.R.Civ.P. 26(g)(2), (3).

With respect to the request for line sheets, the information that plaintiff complains defendants should have produced earlier is essentially system metadata—information about the way a computer file is stored, as opposed to the substance of the file.[111] The

---

nent and to the court." (quoting *Residential Funding Corp.*, 306 F.3d at 112)).

**108.** *See* Conf. Tr., Jan. 4, 2008, at 13–14 ("[T]o give you some background, I spent more than five hours talking to Mr. Feldman on the phone about these issues and we seem to go in complete circles. And he refuses to put anything in writing where I can consider it [ . . . . ]"). Plaintiff submitted this transcript in support of its summary-judgment motions. (*See* Ex. 36 to Pl.'s Summ. J. Mots.).

**109.** The Federal Rules require a responding party to either produce documents "as they are kept in the usual course of business" or "organize and label them to correspond to the categories in the request". Fed.R.Civ.P. 34(b)(2)(E)(i). With respect to electronically stored information, the Federal Rules protect the responding party from having to produce it in more than one form. *See* Fed.R.Civ.P. 34(b)(2)(E)(iii).

**110.** Rule 33 provides that a party served with an interrogatory may produce business records in lieu of answering the interrogatory "[i]f the answer to an interrogatory may be determined by

examining, auditing, compiling, abstracting, or summarizing a party's business records [ . . . ], and if the burden of deriving or ascertaining the answer will be substantially the same for either party". Fed.R.Civ.P. 33(d).

**111.** *See Aguilar v. ICE*, 255 F.R.D. 350, 354 (S.D.N.Y.2008) ("System metadata 'reflects information created by the user or by the organization's information management system.'") (internal citation omitted); *see generally id.* ("Metadata, frequently referred to as 'data about data,' is electronically-stored evidence that describes the 'history, tracking, or management of an electronic document.'") (internal citations omitted); *Latimer v. Roaring Toyz, Inc.*, 574 F.Supp.2d 1265, 1269 n. 6 (M.D.Fla.2008) ("Metadata, commonly described as 'data about data,' is defined as 'a set of data that describes and gives information about other data.' Oxford English Dictionary. Technical Appendix E to The Sedona Guidelines: Best Practice Guidelines & Commentary for Managing Information & Records in the Electronic Age defines metadata to include 'all of the contextual, processing, and use information needed to identify and

Federal Rules of Civil Procedure do not address metadata specifically, although they do lay out some guidelines for the discovery of electronically stored information.[112] Under Rule 34, a requesting party may specify a form of production and request metadata. *Aguilar*, 255 F.R.D. at 355 (citing Fed. R.Civ.P. 34(b)(1)(C)). However, if a request does not specify a particular form, the responding party "must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms" and "need not produce the same electronically stored information in more than one form". Fed.R.Civ.P. 34(b)(2)(E)(ii)-(iii). Generally, "if a party wants metadata, it should 'Ask for it. Up front. Otherwise, if [the party] ask[s] too late or ha[s] already received the document in another form, [it] may be out of luck.'" *Aguilar*, 255 F.R.D. at 355 (quoting Adam J. Levitt & Scott J. Farrell, *Taming the Metadata Beast*, N.Y.L.J., May 16, 2008, at 4). Thus, even if we assume that defendants were obligated to respond at all to the broad requests in "Plaintiff's First Request" and that digital photographs of Mimi So jewelry were responsive, defendants were not obligated under Rule 34—which is specifically incorporated into plaintiff's definition of "document"—to produce the metadata for the digital photographs.

Finally, the available discovery tools enable the efficient resolution of disputes. By making the request formally, plaintiff could have compelled defendants to either produce the information sought or explain the failure, all within a given time frame determined by the timing of plaintiff's request. Plaintiff's decision to make a series of ad hoc complaints to the court, not tied to specific discovery requests, about alleged misconduct by-defendants spanning several years has undoubtedly wasted the time and resources of both parties and the court.

Without being able to examine defendants' responses to any requests or other formal discovery requests that plaintiff may have served, we simply have no basis for determining whether defendants violated any duties stemming from plaintiff's discovery requests. Thus, whether plaintiff can sustain its burden of showing that defendants' alleged eleventh-hour production or failure to produce the "key code" evidence violated any discovery obligation turns on whether there was an applicable court order to which each piece of evidence was responsive.[113]

E. *March 20, 2008 court order*

Plaintiff claims that defendants should have produced the pieces of key code evidence at issue in response to a directive from the court at a March 20, 2008 conference. (*See* Pl.'s Dec. 15, 2009 Letter, at 3). An examination of the transcript of that conference reveals that they are incorrect.

At that conference, plaintiff's counsel articulated a request for "a sample declaration from whoever at defendant knows how to do this, lining up the pictures in the catalogue with the amounts sold. And, you know, if there are more pictures that are not in the catalogue, line those up so that the factfinder knows exactly how many of these were sold." (Conf. Tr., Mar. 20, 2008, at 3). Defendants agreed to produce a declaration, although they noted that plaintiff had not previously asked for this. (*Id.* at 7). Since defendants were receptive to the request, I did not need to issue an order on this point, although I suggested that it might be helpful for the declarant to "use each of the illustrations from the brochure as the foundation point and to describe in his affirmation or declaration the category that he is referencing,

---

certify the scope, authenticity, and integrity of active or archival electronic information or records.' Examples of metadata for electronic documents include: a file's name, a file's location (e.g., directory structure or pathname), file format or file type, file size, file dates (e.g., creation date, date of last data modification, date of last data access, and date of last metadata modification), and file permissions (e.g., who can read the data, who can write to it, and who can run it).'').

112. *Aguilar*, 255 F.R.D. at 355; *see also* Fed. R.Civ.P. 34(a)(1)(A), (b)(2)(E).

113. None of these pieces of evidence falls within the scope of the initial disclosures required by Rule 26(a)(1). Thus, any obligation that defendants may have had to produce the digital files, line sheets, or a new document containing photographs and item numbers must have come from an applicable court order or an appropriate request for production under Rule 34.

based on the particular illustration from the brochure. And then the data that he comes up with in terms of sales." (*Id.* at 8). Plaintiff summarized its request as one for "the complete set of unique identifier codes, so that I can distinguish between these different pieces of jewelry within the family." (*Id.* at 21). I ordered, "If there is such a document, it will be produced." (*Id.* at 22).

My directive to produce any existing documents that contained a complete set of codes plainly did not call for the creation of a new explanatory document or for the production of hundreds of digital photo files or line sheets (which, Mimi So testified, are not a complete list of all codes, and were not retained, in any event).

### F. *December 19, 2008 court order*

Defendants next invoke a conference held after the close of discovery, on December 19, 2008.[114] At this conference, the parties disputed the extent to which photographs had been produced. (*See* Conf. Tr., Dec. 19, 2008, at 9). Defense counsel noted that, "if they are asking for, in effect, a dump of all photographs of Gate B9 in the computer, I'll ask Mimi So to have them printed out." (*Id.* at 13). I issued the following order:

> Although, frankly, the plaintiffs would not be entitled to this at this stage given the posture of this case, in the interest of full disclosure before trial, if there ever is a trial, I will direct that the Mimi So defendants turn over the digital photographs of Gate B9 jewelry that are in their computer together with any item numbers if those item numbers are attached to those photographs in the manner in which the photographs are kept.

(*Id.* at 14–15). I added that the Mimi So defendants were to provide those photos by January 6, 2009. (*Id.* at 17).

In response to this directive, on January 6, 2009, defendants produced the document discussed above, dated January 5, 2009, into which were inserted small photographs and accompanying item numbers and shorthand

textual descriptions. Thus, there is no evidence that defendants should have produced this document any sooner than they did.

Plaintiff complains that defendants should instead have produced the digital files themselves. Plaintiff does not dispute that the January 5, 2009 document (with the January 9, 2009 correction to it) contains all of the photographs that were produced in digital form in August and September 2009, and the corresponding item numbers. Rather, the basis for plaintiff's complaint appears to be that the digital files could be printed out to produce larger and higher quality images than the ones in the January 5 document. (Pl.'s Jan. 15, 2010 Letter at 2).

However, plaintiff did not air its grievance concerning the quality of the photographs in the January 5 document or ask for the actual digital files until a conference on July 22, 2009. (Conf. Tr., July 22, 2009, at 12–13). Although plaintiff mentioned the January 5 document in a February letter to the court, the letter complained that defendants had not created such a document sooner-a far cry from complaining that the document was inadequate and demanding the actual digital files instead. (*See* Steven M. Crosby, Esq. Letter to the Court, Feb. 13, 2009 ("MSI's recent document production evidences that it could have produced the sales-to-pictures correlation at issue during discovery.")). Judge Marrero responded to this letter by directing the parties to direct their complaints to me. (Endorsed Order, Feb. 18, 2009). Yet plaintiff's next letter to the court, on April 10, did not raise any concerns at all regarding defendants' January production. (*See* Pl.'s Apr. 10, 2009 Letter). Finally, at a July 22 conference, plaintiff requested the digital files so that it could try to obtain a clearer printout, and counsel for Mimi So agreed to communicate with his client regarding the request (Conf. Tr., July 22, 2009, at 13), and produced the first batch of digital files on August 4, just a few weeks later.

There is no evidence that plaintiff requested, or that the court ordered, that defendants

---

114. *E.g.,* Pl.'s Dec. 15, 2009 Letter at 4 ("In December of 2008, MSI's counsel admitted before your Honor that it kept photographs of the Gate B9 jewelry in digital form. Your Honor

ordered the digital photographs [ ... ] produced [ ... ]"); *see also* Conf. Tr., Dec. 19, 2008, at 13 (observing that "Discovery is closed.").

produce the JPEG files containing the digital photographs before discovery closed. Although the computer files would certainly have been responsive to my December 19, 2008 order, the document that defendants produced in lieu of the digital files was also responsive. Moreover, there is no reason to believe that defendants intentionally offered an inferior substitute for the digital files, particularly in light of defendants' relatively prompt—and completely voluntary—provision of the digital files shortly after plaintiff first voiced its complaint regarding the quality of the photos in the January 5 document.

### G. Alleged Misrepresentations Regarding "Key Code" Evidence

Plaintiff also complains that defendants misrepresented the record concerning their possession of various pieces of "key code" evidence.[115] Plaintiff invokes the declarations of William Richardson for Mimi So that defendants proffered after our March 20, 2008 conference to help plaintiff understand Mimi So's item number system. These declarations contain three statements related to defendants' possession of evidence connecting jewelry images to item numbers. First, in an April 10, 2008 declaration, Richardson represented that he was unable to provide sales data for each of the specific pieces of jewelry pictured in the 2006 Gate B9 brochure because the brochure did not list any item numbers. (Richardson Apr. 10, 2008 Decl. ¶ 2). Second, in a September 19, 2008 declaration, Richardson testified that "There is no automated method available to me, or any other employee at MSI, to use an image of a[n] item as a starting point and derive related sales data for that item, with any degree of accuracy, when such image is not accompanied or labeled with an item number." (Richardson Sep. 19, 2008 Decl. ¶ 5). Third, in the same declaration, Richardson responded to plaintiff's complaints regarding "line sheets", testifying that "MSI does have

certain pictures in its computer database, but it is my understanding that R.F.M.A.S. never properly requested them during fact discovery. MSI would not, and does not, have any hesitation about producing them. However, those photographs are not of the best quality, and lack clarity", adding that documents already produced to plaintiff contained better images and far more detailed sales information than any line sheets would. (Id. ¶ 12).

There is nothing in the record to call into question the accuracy of any of these pieces of testimony by Mr. Richardson.

Both the first and second pieces of testimony make clear that Mimi So maintains sales data for particular item numbers, and not for particular photographs, a fact that plaintiff does not challenge, and which should have helped plaintiff to analyze the evidence and to articulate appropriate discovery requests aimed at obtaining a master list of item numbers and photographs.

With respect to Richardson's statement that he could not determine sales data for each piece featured in the Gate B9 brochure without item numbers, this is plainly true because Richardson's possession of a complete set of photographs and corresponding item numbers would still not ensure his ability to determine sales for each image in the brochure unless he could also match each photograph in the brochure to a different photograph for which he had an item number.[116] His statement that there was no "automated" means of deriving sales information for a particular photograph is likewise true, and explicitly leaves open the possibility that he could do it manually, for example, through a series of steps beginning with matching the photograph for which sales data is sought to a photograph labeled with an item number, and then deriving sales data for that item number. As we noted earlier, it is questionable whether the tools of discovery would have allowed plaintiff to de-

---

115. *E.g.*, Pl.'s Mem. Law Supp. Summ. J. Mot. Agst. Mimi So Defs. at 6 (complaining about defendants' alleged "misrepresentation and withholding of the evidence tying the jewelry pictured in their catalog to the sales numbers").

116. *See* Barry G. Magidoff, Esq. Letter to the Court, June 6, 2008, available at Ex. 107 to Pl.'s

Summ. J. Mots., at 3 (distinguishing between 2007 Gate B9 catalogue with item numbers, for which sales could be determined manually by examining invoices, and 2006 catalogue without item numbers, for which sales could not be determined).

mand that defendants undertake this multi-step process of analyzing the evidence for plaintiff. Plainly, the most promising course for plaintiff would have been to request the tools necessary to carry out this task manually. Unfortunately, there is no evidence that plaintiff made an adequate request for this information, as we explained above and as Mr. Richardson pointed out in his September 19, 2008 declaration. (*See* Richardson Sep. 19, 2008 Decl. ¶ 12 (stating that plaintiff "never properly requested [photographs] during fact discovery")).

In sum, despite having ample opportunity to do so, plaintiff has not substantiated its claims that defendants faltered in any obligation to produce "key code" evidence, or that they misrepresented the facts concerning their possession of this evidence to plaintiff or to the court.

## V. *APPROPRIATE SANCTIONS FOR SPOLIATION*

■■■ As we explained above, we find that the Mimi So defendants spoliated exemplars of the large-link pieces of jewelry, that they made either false or seriously misleading statements to plaintiff's counsel and to the court about their possession of those items, and that the spoliation and deceptive statements were at best grossly negligent. Defendants' gross negligence is sufficient to allow a reasonable trier of fact to infer that the spoliated jewelry exemplars would have supported plaintiff's claims. *See Residential Funding Corp.*, 306 F.3d at 109. Because of the seriousness of these violations, the relevance of the spoliated evidence, and the Mimi So defendants' culpability, sanctions are warranted. *See id.* at 108.

### A. *Prejudice*

According to plaintiff, defendants' failure to make exemplars of these pieces available for inspection by plaintiff during discovery prejudiced plaintiff because, without the pieces, plaintiff could not effectively cross-examine various representatives of Mimi So, Richemont, and Neiman Marcus at their depositions; could not adequately prepare its own expert witnesses or cross-examine defendants' expert witnesses; and could not adequately defend against defendants' motions for summary judgment. (Pl.'s Dec. 15, 2009 Letter at 4; *see also* Pl.'s Dec. 30, 2009 Letter at 4; Pl.'s Jan. 11, 2010 Letter at 7–8). Plaintiff also adds that it will suffer prejudice because plaintiff "will be required to try [its] infringement case without the key pieces." (Pl.'s Dec. 30, 2009 Letter at 4; *see also* Pl.'s Jan. 11, 2010 Letter at 8 "Plaintiff will be required to proceed to trial without the jewelry."). Defendants dispute each of plaintiff's contentions and take the position that plaintiff did not suffer any prejudice from the spoliation of the exemplars. (*See* Defs.' Dec. 21, 2009 Letter at 4). They also argue that their offers to manufacture a large-link necklace for plaintiff to inspect obviated any potential prejudice from the spoliation. (*See id.* at 4–5). The Mimi So defendants first mentioned the possibility of manufacturing a large-link necklace for plaintiff to inspect at the January 2008 deposition of Mr. Richardson, noting that they had not yet made an exemplar for plaintiff to inspect because they did not previously have the necessary components. (Richardson Dep., Jan. 4, 2008, at 13). They first made a formal offer to manufacture a new piece in September 2008 in their legal brief in opposition to plaintiff's motion for summary judgment, and renewed the offer in December 2009 and January 2010 by email to plaintiff's counsel.[117]

---

117. Mimi So Defs.' Mem. Law Opp. Pl.'s Summ. J. Mot. at 10–11 ("While MSI believes that it has gone above and beyond any discovery obligation or requirement it might have, MSI hereby offers to manufacture as identical a copy as possible of the large link jewelry that Plaintiff believes to have been secreted away. Of course, MSI's offer is contingent upon P actually being able to identify what items it says were the victims of MSI's alleged spoliation."); Ex. 6 to Defs.' Dec. 21, 2009 Letter (Dec. 16, 2009 Email from Victoria Spataro to Theodore Anderson et al. stating that

"Ms. So is considering making a large link necklace and bracelet for purposes of this litigation. In this regard, we will notify Plaintiff so that it may inspect the pieces once completed."); Ex. F to John Margiotta, Esq. Decl., Jan. 14, 2010 ["Margiotta Jan. 14, 2010 Decl."] (Jan. 4, 2010 Email from Victoria Spataro to Theodore Anderson et al., stating, "Further to my December 16 email, MSI has completed its manufacture of a large link necklace and large link bracelet for purposes of this litigation. The pieces will be

Although we bear in mind that it is defendants' burden to prove the absence of prejudice, we agree that plaintiff's claims of prejudice are, at least in part, unpersuasive. However, we find that the spoliation hampered plaintiff to a degree in examining defendants' witnesses and plainly caused plaintiff to expend unnecessary time and money. Moreover, Mimi So's alleged willingness to manufacture new pieces upon request does not change the fact that the Mimi So defendants spoliated evidence by shipping or disassembling the only exemplars in its possession, and that as a result none were available for inspection by plaintiff at the agreed-upon inspection time. It simply was not incumbent upon plaintiff to ask for this accommodation. It was Mimi So's burden to seek relief from its obligation to preserve evidence.

We do not doubt that a person who had examined the physical samples of jewelry would be better equipped to observe any similarities or differences between the pieces than one who only examined photographs, even if they were high-quality photographs. However, in plaintiff's motion papers, it has failed to explain what it would have sought to learn from the representatives of defendants and Neiman Marcus at their depositions if it had been able to confront these fact witnesses with exemplars of the large-link necklace and bracelet rather than simply photographs of them. Based on the deposition excerpts that plaintiff supplied, we infer that plaintiff wished to elicit the opinions of Mr. McQuigg and Mr. Mawicke of Richemont, Mr. Richardson of Mimi So, and Lisa Razor

of Neiman Marcus on whether the key Mimi So pieces were similar to plaintiff's pieces.[118] But it is not obvious that having defendants' representatives examine the pieces would have triggered admissions of similarity. Moreover, confronting defendants at their depositions with both sets of jewelry would not help plaintiff to establish either the ordinary observer's perception of the parties' respective jewelry or defendants' state of mind at the time of the alleged infringement. At best, it would only establish whether or not defendants' agents presently perceive any similarity between the parties' jewelry.

Plaintiff's explicit complaint of prejudice—that the lack of exemplars of the large-link pieces impaired its ability to depose defendants' experts—is belied by the record. Defendants had exemplars of two of the four allegedly infringing "key pieces" available at the time that plaintiff deposed defendants' experts. (*Supra*, at 26–27 & n. 57, 27–28 & n. 61). However, defendants report—and plaintiff does not dispute—that plaintiff did not ask defendants to make any jewelry available at the depositions, and plaintiff did not bring exemplars of its own pieces. (Defs.' Dec. 21, 2009 Letter at 4; Defs.' Jan. 14, 2010 Mem. at 5). Indeed, plaintiff elected to depose Mr. Lent (one of defendants' liability experts) by telephone, foregoing even the opportunity to show him photographs of the key pieces. (*Id.*).

Plaintiff has failed to identify any other way in which its defense against defendants' motions for summary judgment was prejudiced by its inability to inspect the large-link necklace and bracelet. The only issue raised

available for inspection at our office on Thursday, January 7 or Friday, January 8 from 2–4 p.m. Please let us know on what day Plaintiff would like to view the pieces.").

**118.** McQuigg Dep., Feb. 20, 2008, available at Ex. B to Crosby Jan. 11, 2010 Decl., at 224 ("Q: Do they look like they're manufactured by the same company? [ . . . ] A: "I don't have enough information to answer that question intelligently. I'm not trying to be evasive. But I—that's a horrible photograph." "); Mawicke Dep., Jan. 9, 2008, available at Ex. B to Crosby Jan. 11, 2010 Decl., at 213 (showing Mawicke photographs of Mimi So catalog and plaintiff's jewelry, and asking "I would like you to look at them and, A, do you see if you see any similarity between the two?"); Lisa Kazor Dep., June 23, 2008, avail-

able at Ex. B to Crosby Jan. 11, 2010 Decl., at 95 (discussing Mr. Mennella's complaints about the similarity of Neiman Marcus's ad for Mimi So jewelry to an ad for plaintiff's jewelry, and asking of the art direction for the latter, "did it look to you like it was duplicated?"); Richardson Dep., Jan. 8, 2008, available at Ex. B to Crosby Jan. 11, 2010 Decl., at 228 ("I ask you to tell me if you see any differences between Exhibit 13A, page 4, and Exhibit 14A?"). We infer that McQuigg, Mawicke, and Richardson were shown photographs of plaintiff's jewelry and Mimi So's allegedly infringing jewelry, although plaintiff has not submitted the exhibits shown to these witnesses. The excerpts of Ms. Kazor's deposition do not refer to any exhibits.

by defendants to which this physical evidence would have been arguably relevant is the Mimi So defendants' motion for summary judgment on plaintiff copyright-infringement claim, which they argued must fail for lack of substantial similarity. The court denied summary judgment on this basis, in part because "the Court does not have before it physical examples of the two large-link necklaces, and the photographic comparisons of the remaining works are not particularly large or clear." *R.F.M.A.S., Inc.,* 619 F.Supp.2d at 66. Thus, if anything, the spoliation appears to have worked to plaintiff's advantage in defending against defendants' Rule 56 motions. At any rate, if defendants' spoliation prevented plaintiff from presenting evidence necessary to oppose defendants' summary-judgment motions, plaintiff should have submitted an affidavit attesting to this circumstance and moved for relief under Rule 56(f).[119] Plaintiff failed to do so.[120]

Plaintiff's claim of prejudice resulting from the inability to show its own experts the actual pieces is more persuasive. Plaintiff hired its liability experts, Joyce Jonas and Edward Lewand, to testify on the relevant similarities and differences between plaintiff's jewelry and the allegedly infringing Mimi So pieces, among other things. (Joyce Jonas Report, Sep. 15, 2009, available at Ex. 3 to Richard Lehv, Esq. Decl., Dec. 1, 2009, at 2; Edward Lewand Report, Sep. 15, 2009, available at Ex. 4 to Richard Lehv, Esq. Decl., Dec. 1, 2009, at 1). It is clear that an actual examination of the allegedly infringing jewelry would have provided a stronger foundation for these experts' opinions. Photographs are a poor substitute for the actual pieces. As plaintiff points out, its experts

were unable to comment on the weight of the jewelry. (*See* Pl.'s Jan. 15, 2010 Letter at 2). In addition, the available photos were a poor substitute for a visual inspection of the pieces; Judge Marrero and all parties have commented on the poor quality of defendants' photographs.[121]

That said, however, the prejudice resulting from plaintiff's experts' inability to examine the pieces is due in part to plaintiff's delay in seeking an appropriate remedy. In light of defendants' offer to manufacture new large-link pieces for inspection by plaintiff, an order directing the Mimi So defendants to do this before the expert-discovery period would have been an appropriate response to their spoliation of the existing exemplars. However, plaintiff waited to file its motion seeking redress for this spoliation until the prejudice to plaintiff's experts had already occurred and it was too late to issue an order to make an exemplar for plaintiff's experts to inspect.

Plaintiff first raised its claim of spoliation in its motion for summary judgment, approximately two months after it obtained the Mimi So invoices reflecting spoliation.[122] In his decision on the parties' cross-motions for summary judgment, Judge Marrero declined to rule on plaintiff's allegations of spoliation, and noted that I had worked with plaintiffs to help bridge the gaps in defendants' discovery, and that if plaintiff remained dissatisfied with defendants' compliance, it should have raised the issue with me. *R.F.M.A.S., Inc.,* 606 F.Supp.2d at 498–99. Judge Marrero issued a lengthier opinion addressing the parties' cross-motions of summary judgment on May 14, 2009, *see R.F.M.A.S., Inc.,* 619

---

**119.** "If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion, (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order." Fed.R.Civ.P. 56(f)(1)–(3).

**120.** *See generally* Pl.'s Mem. Law Opp. Richemont Defs.' Summ. J. Mot., Sep. 19, 2008, filed under seal at Docket # 106; Pl.'s Mem. Law Opp. Mimi So Defs.' Summ. J. Mot., Sep. 19, 2008, filed under seal at Docket # 106.

**121.** *R.F.M.A.S., Inc.,* 619 F.Supp.2d at 66; Pl.'s Jan. 15, 2010 Letter at 2 (citing *id.*); McQuigg

Dep., Feb. 20, 2008, at 224 ("I don't have enough information to answer that question intelligently. [ . . . ] [T]hat's a horrible photograph."); Richardson Sep. 19, 2008 Decl. ¶ 12 ("MSI does have certain pictures in its computer database [ . . . . ] However, those photographs are not of the best quality, and lack clarity").

**122.** *See* Ex. B to Pl.'s Dec. 15, 2009 Letter (emails dated June 18, 2008, discussing Mar. 8, 2007 invoice); Defs.' Jan. 14, 2010 Mem. at 4 (stating that plaintiff has had Dec. 13, 2007 invoice "since, at the latest, June, 2008" (citing Ex. G to Defs.' Jan. 14, 2010 Mem.)).

F.Supp.2d at 39, and on June 2, 2009, he granted the application of Mimi So's counsel to withdraw, giving Mimi So until July 1, 2009 to obtain new counsel. (Order, June 2, 2009).

We may assume it would have been proper for plaintiff to wait until Judge Marrero had issued the final opinion on the summary-judgment motions and Mimi So had acquired new counsel before bringing its complaints to my attention.[123] However, plaintiff did not raise the issue of spoliation at our July 22, 2009 conference. (*See* Conf. Tr., July 22, 2009).

On August 31, 2009, Mimi So produced pieces for inspection by plaintiff's experts, but did not produce a large-link necklace or bracelet, despite having offered in its motion for summary judgment to manufacture a new piece for inspection by plaintiff. Plaintiff did not bring the issue to our attention then, either.[124] Instead, plaintiff proceeded through the entirety of expert discovery without a word about spoliation, only to complain a month later about the inability of plaintiff's experts to examine the exemplars.[125]

Plaintiff attempts to explain the delay on the basis that it did not obtain the "smoking gun evidence" that supports this motion for sanctions until November 2009, when it deposed Mr. Lent and Ms. Kelly and learned that they had seen exemplars of the relevant pieces earlier. (Pl.'s Dec. 30, 2009 Letter at

4). For reasons already noted, however, we are not persuaded by plaintiff's attempt to justify the delay. As we explained above, the full context of these depositions undermines plaintiff's claim that defendants' experts actually saw the large-link pieces in person. Moreover, plaintiff had the information necessary to identify shipments of the large-link necklace and bracelet reflected in Mimi So billing memos in 2008. The Mimi So line sheets contained images of these pieces and the corresponding item numbers, and plaintiff received these around July 2008. Indeed, in a December 5, 2008 letter to Judge Marrero, plaintiff noted the item number of the key large-link necklace,[126] and at a conference on December 18, 2008, plaintiff acknowledged that it had received the information necessary to correlate item numbers and photographs.[127] Once plaintiff had the invoices and a key allowing it to understand the invoices, it had all the evidence of possible spoliation that it needed.

Finally, defendants also point out that plaintiff could have obtained the spoliated evidence from another source—namely, Neiman Marcus.[128] Plaintiff contends that pieces at Neiman Marcus were within defendants' "control" and that it was defendants' duty, not plaintiff's, to make such an inspection possible (Pl.'s Reply to Mimi So's Opp., Oct. 10, 2008, at 5)—a position that we rejected above for lack of support. (*Supra*, at 35–36). Moreover, although plaintiff also argued

**123.** *See* Steven M. Crosby, Esq. Letter to the Court, Feb. 23, 2009 (recognizing that, as a practical matter, the proceedings intended to resolve allegations concerning defendants' destruction and withholding of evidence were likely to be suspended until Mimi So could obtain new counsel).

**124.** Plaintiff wrote to the court several times in September 2009, but none of these letters raised the issue of defendants' failure to produce all four allegedly infringing pieces for inspection by plaintiff's experts. (*See* Steven M. Crosby, Esq. Letter to the Court, dated Sep. 3, 2009; Steven M. Crosby, Esq. Letter to the Court, dated Sep. 8, 2009; Steven M. Crosby, Esq. Letter to the Court, dated Sep. 25, 2009).

**125.** Expert discovery closed on November 15, 2009. (Endorsed Order, Sep. 8, 2009). On December 15, 2009, plaintiff wrote a letter to the court requesting permission to file a motion for

sanctions for spoliation. (Pl.'s Dec. 15, 2009 Letter).

**126.** Defs.' Jan. 14, 2010 Mem. at 2 (citing Pl.'s Dec. 5, 2008 Letter to the Court, available at Ex. B to Defs.' Jan. 14, 2010 Mem.).

**127.** Conf. Tr., Dec. 19, 2008, at 2 ("As a result of our recent obtaining of the line sheets [ ... ] from the deposition of Neiman–Marcus, we were finally able to obtain some document to coordinate the index numbers or the item numbers with the pictures of the pieces.").

**128.** Mimi So Defs.' Mem. Law Opp. Pl.'s Summ. J. Mot., Sep. 19, 2008, at 10; *see also Passlogix, Inc.*, 708 F.Supp.2d at 417, 2010 WL 1702216, at *32 (absence of prejudice can be shown by demonstrating that other party was able to obtain the same evidence from another source) (internal citations omitted).

that it was unable to obtain the key pieces elsewhere (Pl.'s Reply to Mimi So's Opp., Oct. 10, 2008, at 5)—asserting that it employed independent investigators to attempt to track down the pieces, including at Neiman Marcus [129]—there is no indication that plaintiff took the formal step that should have enabled it to access the large-link Gate B9 pieces from Neiman Marcus, that is, by non-party subpoena.

In sum, plaintiff's claim of prejudice from spoliation by defendants is somewhat overblown. Plaintiff undoubtedly had to spend additional time and energy pursuing discovery that would not have been necessary if defendants had fulfilled their obligation to preserve evidence and had been able to produce it at the appropriate times. However, the most significant prejudice—the inability of plaintiff's experts to examine the exemplars—is partly due to plaintiff's decisions not to pursue the relevant discovery from Neiman Marcus and not to seek relief before me, as Judge Marrero had directed, until after expert discovery had closed.

### B. *Possible Sanctions*

Under these circumstances, the jury instruction that plaintiff seeks is not appropriate. An adverse inference instruction is a severe sanction. *See Residential Funding Corp.*, 306 F.3d at 108. This is particularly evident here; in a copyright infringement action, instructing the jury that it "may assume that [the spoliated jewelry exemplars] would have been unfavorable to Defendants", would be devastating to defendants' case. In Judge Marrero's decision on the parties' summary-judgment motions, he noted that he was not convinced that the alleged spoliation in this case approached the severity of the misconduct in the cases that plaintiff

cited in support of its argument that it was entitled to harsh sanctions. *R.F.M.A.S., Inc.*, 606 F.Supp.2d at 499 n. 2. And the alternative sanction that plaintiff proposes—an order excluding the testimony of defendants' experts—is wholly inappropriate in light of the absence of evidence in the record that defendants' experts actually saw the spoliated pieces.

Nevertheless, there are measures open to plaintiff that may properly readjust the balance to the extent that it was tilted by defendants' failure to offer the items in dispute for examination. First, to the extent that the record reflects a failure by the Mimi So defendants to preserve exemplars or seek relief excusing them from this obligation, plaintiff will be free to offer evidence of that failing at trial to explain the plaintiffs' experts' reliance on photographs (including poor quality photos). In addition, insofar as the Mimi So defendants made false or materially incomplete representations about the availability of exemplars, plaintiff will be permitted to offer evidence of those statement and their falsity or misleading nature both to impeach any such individuals as witnesses and to explain why plaintiff does not have for trial either the exemplars or better-quality photographs of them.[130]

▪ Second, plaintiff has been compelled by the Mimi So defendants' spoliation to expend additional resources in pursuit of a remedy. Those expenses are properly compensable. Costs, including attorneys' fees, are appropriate when a defendant has unjustifiably destroyed evidence that it was under a duty to preserve, "causing the plaintiff to expend time and effort in attempting to track

**129.** Plaintiff offered sworn testimony that it "pursued independent investigation through contacts in the jewelry industry, and possible investigators to try and locate the Gate B9 large link necklace and bracelet. One such investigator stated she found the large link Gate B9 piece on sale at Neiman Marcus and took photographs of it." (Kenneth S. Feldman, Esq. Decl., [undated], filed under seal at Docket # 134, ¶ 16). Somewhat in tension with this account, in a footnote of a legal brief, plaintiff stated that Neiman Marcus refused plaintiff's request to photograph its Gate B9 pieces. (Pl.'s Reply to Mimi So's Opp., Oct. 10, 2008, at 5 n. 7). At any rate, we infer

that plaintiff's efforts to obtain the exemplar evidence from Neiman Marcus through informal methods were, on the whole, unsuccessful.

**130.** We have noted that during the briefing of the summary-judgment motions, the Mimi So defendants offered to manufacture new exemplars of the disputed pieces, an offer that plaintiff never accepted. The parties are free to agree on this step as a means of avoiding some of the issues otherwise to be litigated at trial, but such a step may be done only by mutual agreement.

down the relevant information". *Turner*, 142 F.R.D. at 78. "[C]ompensable costs may arise either from the discovery necessary to identify alternative sources of information, or from the investigation and litigation of the document destruction itself." *Id.* (internal citations omitted); *see also Zubulake Revisited*, 685 F.Supp.2d at 497 (sanctioning plaintiffs who were negligent in providing discovery by issuing a monetary sanction of reasonable costs, including attorneys' fees, associated with reviewing declarations submitted, deposing these declarants, and bringing motion for sanctions). In order to accomplish the goals of compensating plaintiff for the harm suffered from the Mimi So defendants' spoliation, shifting to the spoliating party the risk of an erroneous judgment resulting from the unavailability of evidence, and punishing the Mimi So defendants and deterring future discovery violations, we will award plaintiff reasonable attorneys fees and costs incurred in pursuing the spoliated jewelry exemplars from the Mimi So defendants, and in bringing its motions for sanctions. Plaintiff is authorized to serve and file one or more affidavits, accompanied by detailed records of these fees and costs, but it must separate out fees and costs incurred pursuing sanctions for the allegedly spoliated "visual correlation" or "key code evidence"—expenses that will not be reimbursed—from those incurred pursuing sanctions for spoliation of the large-link pieces. We note that in determining what fees are "reasonable", we will remain cognizant of the possibility that plaintiff's delay in bringing this motion rendered the litigation of this motion unnecessarily inefficient and resulted in some unnecessary—and thus, unreasonable—expenses. Plaintiff is to submit this application in accordance with governing case law within seven days of this order. Defendants may serve and file responding papers within seven days thereafter.

## VI. *DEFENDANTS' APPLICATION FOR FEES*

Although the Mimi So and Richemont defendants addressed plaintiff's allegations of spoliation separately on summary judgment, they submitted one set of papers in opposition to plaintiff's renewed "spoliation motion". (*See* Defs.' Dec. 21, 2009 Letter; Defs.' Jan. 14, 2010 Mem.). In these papers, apart from opposing plaintiff's motion, they alleged that plaintiff has violated its obligation to discuss the alleged discovery deficiencies with opposing counsel before bringing them to the attention of the court, and they asked for sanctions against plaintiff in the form of a shifting of the costs and fees incurred in defending against this motion. (*E.g.*, Defs.' Dec. 21, 2009 Letter at 5; Defs.' Jan. 14, 2010 Mem. at 6).

Defendants have not identified the legal basis for this application, much less demonstrated that they satisfy the governing standards. Accordingly, defendants' request is denied.

## *CONCLUSION*

We conclude that plaintiff has failed to prove any facts that might warrant the imposition of sanctions upon the Richemont defendants. We find that the Mimi So defendants did not violate any discovery obligation with respect to the key code plaintiff sought, but that they spoliated relevant evidence that they were under an obligation to preserve—namely, exemplars of the so-called "large-link" necklace and bracelet, two of the four pieces of jewelry alleged to infringe on plaintiff's intellectual property—and that they made either false or materially misleading representations to plaintiff and the court regarding their access to these exemplars. Although we find that their spoliation and misstatements warrant the imposition of sanctions, we decline to adopt any of plaintiff's proposed sanctions. Instead, we hold that plaintiff is entitled to offer evidence of the spoliation and false or misleading statements at trial for the purposes that we have identified, and that plaintiff is entitled to an award of reasonable attorneys' fees and costs incurred because of the spoliation, to be determined based upon a further application consistent with this opinion. Finally, defendants' application for costs and fees is denied.

**SO ORDERED.**

## MEMORANDUM & ORDER

On August 10, 2010, we issued a memorandum and order addressing a motion for sanctions by the plaintiff. That motion was premised in large measure on defendants' asserted failure to retain exemplars of items of jewelry that were said to have infringed plaintiff's copyright and trade-dress rights in a series of high-priced jewelry pieces. In our decision we granted plaintiff's motion in part, finding that the Mimi So defendants had violated their obligation to retain exemplars for such time as was necessary to make them available for inspection by plaintiff and that plaintiff had been prejudiced by that omission and by various misstatements by Mimi So concerning the pertinent events. We therefore granted limited relief to plaintiff, principally allowing it to offer evidence to explain the absence of either exemplars or adequate reproductions of the original allegedly infringing pieces.

Defendants have since moved for reconsideration and amendment of our decision in two narrow respects. First, pointing to our reference to the allegedly poor quality of photographs of jewelry made available to plaintiff (*see* Memorandum & Order ("M & O") at 52 & 50), they assert that they did provide good-quality photos to plaintiff's counsel, which plaintiff then chose not to use in deposition or in its summary-judgment motion papers. (Defs.' Mem. of Law at 2–4). Second, although we referred to defendants having belatedly offered to manufacture new exemplars for plaintiff (M & O at 52 n. 130), defendants complain that we ignored the fact that they had indeed created such exemplars and exhibited them for plaintiff and its experts. (Defs.' Mem. of Law at 4).

Defendants' motion is denied. Such a motion must rest on a demonstration that the court overlooked material facts in the record or pertinent legal authority or that failure to alter some aspect of the prior decision would result in "manifest injustice." *See, e.g., Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 2001 WL 1042051, *1 (S.D.N.Y. Sept.7, 2001). Judged by these standards, defendants fail to carry their burden.

We did not overlook the photographs produced by defendants in discovery insofar as they were exhibits to the defendants' summary-judgment motion papers. We judged them of poor quality as apparently did the District Court.[1] In any event, we ruled in the sanctions decision that plaintiff was free to present to the trier of fact evidence reflecting the impact on it of the defendants' conceded failure to retain exemplars, and obviously defendants will be free to counter that evidence, including by way of showing the jury any photographs produced to plaintiff in discovery.[2]

Defendants' second argument concerns a footnote in which we mentioned defendants' offer to create new exemplars of the allegedly infringing items. In that footnote we simply noted that the parties were free to agree on such a step although plaintiff had not yet agreed, and indicated that the Mimi So defendants could not evade responsibility for their spoliation by the late production of such items absent plaintiff's consent. (M & O at 52 n. 130). Defendants now assert that they did indeed prepare such exemplars in December 2009 and that the plaintiff's attorneys and experts viewed them on January 14, 2010. Even if this is correct—and plaintiff's counsel represents that the attorneys, but not the experts, viewed the new exemplars—that is irrelevant to our point. We made clear that plaintiff was free to agree to use such after-the-fact manufactured exemplars or not, as it chose. Moreover, in any event there was nothing in the record demonstrating that plaintiff had elected to surrender its position about the effect of defendants' spoliation on plaintiff's ability to prove its case. Furthermore, the record before us did not

---

1. It also appears that the photos now cited by defendants were not specifically linked at the time to any items actually being marketed by defendants. (*See* Pl.'s Resp. at 2).

2. Defendants appear also to quarrel with our reference to "defendants'" photographs (M & O at 50), implying that they are not responsible for plaintiff's use of a series of small photos taken from defendants' sales brochures. Plainly all of the photos in question were originally taken by or on behalf of the defendants. That is all that we meant or implied.

demonstrate that an inspection had taken place or that defendants had consented to plaintiff's use of the exemplars at trial, or that plaintiff had agreed to such a procedure—only that defendants had prepared exemplars and that plaintiff's attorneys were scheduled to look at them.

Finally, the essential point we made about the exemplars remains unaffected. Defendants disposed of all exemplars when they were obligated to retain them for plaintiff's inspection, and plaintiff may properly seek to demonstrate to the trier of fact both that default by defendants and its impact on plaintiff's case. If defendants want to proffer the fact that, long after discovery had closed, they prepared certain pieces of jewelry for plaintiff to inspect and that these pieces of jewelry matched the allegedly infringing ones that defendants had previously sold, they will be free to do so.

## CONCLUSION

For the reasons stated, defendants' motion for reconsideration and amendment of the August 10 M & O is denied.